James B. TENNY, Petitioner,

v.

Janie COCKRELL, Director, Texas Department of Criminal Justice—Institutional Division, Respondent.

No. A–01–CA–409–SS.

United States District Court,
W.D. Texas,
Austin Division.

April 5, 2004.

Christopher V. Ryan, David B. Weaver, Willem G. Schuurman, Vinson & Elkins, LLP, Austin, TX, for Petitioner.

James R. Smith, Attorney at Law, Elizabeth A. Goettert, Linda E. Garza, Office of Attorney General, Assistant Attorney General, Dana L. Mills, Attorney at Law, Austin, TX, for Respondent.

## ORDER

SPARKS, District Judge.

Before this Court are Petitioner James B. Tenny's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[# 1], and the Report and Recommendation of the United States Magistrate Judge [# 42]. All matters in this case were referred to the Honorable Stephen H. Capelle, United States Magistrate Judge, for Report and Recommendation pursuant to 28 U.S.C. § 636(b), and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges, as amended, effective December 1, 2002. On August 8, 2003, the Magistrate Judge issued his Report and Recommendation that Tenny's Petition for Writ of Habeas Corpus be granted, and that Tenny be released unless the State provides Tenny with a new trial within 60 days of the final judgment in this case. Tenny filed written objections to the Magistrate's Report and Recommendation on September 16, 2003[# 45]. On September 16, 2003, Respondent filed written objections to the Magistrate's Report and Recommendation [# 47]. Having considered the petition, the case file as a whole, the state court records, and the applicable law, the Court enters the following opinion and orders.

### Procedural Background

According to Respondent, the Director has lawful and valid custody of Tenny pur-

suant to a judgment and sentence of the 33rd Judicial District Court of Blanco County, Texas, styled *The State of Texas v. James Bernard Tenny.* On July 30, 1997, Tenny was indicted on one count of murder with a deadly weapon. Tenny pleaded not guilty to the charge and on May 14, 1999, he was convicted by a jury and sentenced to 65 years imprisonment.

Tenny appealed his conviction, alleging through appellate counsel, that a shower scrubber had been improperly admitted into evidence. Tenny also sent a *pro se* supplemental brief to the appellate court, alleging his counsel at trial and on appeal rendered ineffective assistance, the evidence was insufficient to support his conviction, and the prosecutor made improper, prejudicial arguments to the jury. The court of appeals received Tenny's brief but did not file it. On August 31, 2000, the court of appeals affirmed Tenny's conviction in an unpublished opinion. Tenny did not file a petition for discretionary review.

On December 18, 2000, Tenny filed a *pro se* state application for habeas corpus relief, raising the same claims raised in his unfiled supplemental appellate brief. *Ex parte Tenny,* Appl. No. 48,704–01, at 3–38. On April 11, 2001, the Texas Court of Criminal Appeals denied Tenny's application—without an opinion and without a hearing, the opportunity to conduct discovery, or otherwise expand the record by the state district court. *Id.* at cover.

Although it is not clear from the record, the trial court apparently ordered the State to file affidavits in response to Tenny's state application for habeas corpus relief. *Id.* The affidavits relied upon by the state court were from Sam Oatman, District Attorney for the 33rd Judicial District of Texas, and Tom Cloudt, First Assistant District Attorney for that district. *Id.* at 99–102. The only issue discussed in the affidavits was whether Tenny's trial counsel, John Bennett, had a conflict of interest at the time of trial as he was hired by the Blanco County District Attorney's Office shortly after Tenny's trial concluded. *Id.* The only finding made by the trial court was no offer of employment or prospective employment nor any conversation inducing any hope of employment, were made to Bennett prior to the conclusion of the trial. *Id.* at 104. The trial court concluded Tenny's allegation of a conflict did not form the basis for a claim of ineffective assistance of counsel, for unexplained reasons, and thereafter ignored the remainder of Tenny's claims. On June 22, 2001, Tenny filed a *pro se* petition for a federal writ of habeas corpus with this Court. After reviewing the petition and the State's answer, the Magistrate Judge concluded, on February 27, 2002, that an evidentiary hearing, regarding the issues of ineffective assistance of counsel at trial and sentencing, should be held and Tenny was indigent. The Magistrate Judge appointed counsel to represent Tenny and the evidentiary hearing was held on November 13, 2002.

### Trial Testimony

On the night of her death, May 12, 1997, Joyce Mulvey and Jim Tenny had an argument over Tenny moving out of their house so he could have his son come live with him. May 10–14, 1999 Trial Transcript ("Tr. Trans."), vol. 6, p. 53, ln. 16—p. 55, ln. 23. Tenny testified he left the room to allow things to "cool down" and upon returning to the kitchen, Mulvey attacked him with a gas can. Tr. Trans., vol. 6, p. 56, ln. 13—p. 59, ln. 9. Mulvey sloshed gasoline into Tenny's eyes and all over his body. Tr. Trans., vol. 6, p. 59, ln. 17–24. Tenny further testified he could hear the clicking of a lighter and saw Mulvey approaching with a lighter. Tr. Trans., vol. 6, p. 60, ln. 2–21. The fight escalated from there with Tenny punching Mulvey to keep

her away. Tr. Trans., vol. 6, p. 62, ln. 13–23.

Tenny called 911 at 9:28 p.m. requesting help because "[his] old lady [wa]s trying, trying to burn down the house." Tr. Trans., vol. 6, p. 64, ln. 8–10. According to Tenny, Mulvey then smashed a platter over his head, thereby ending the emergency call. Tr. Trans., vol. 6, p. 64, ln. 13–25. Mulvey continued her attack on Tenny with a butcher knife and they engaged in a violent struggle for the knife in which Tenny sustained several injuries, including a stab wound to his chest, which collapsed his lung. Tr. Trans., vol. 6, p. 67, ln. 2–25. Tenny then stabbed Mulvey believing it necessary to defend his own life and caused the death of Mulvey. Tr. Trans., vol. 6, p. 103, ln. 14–21.

There was no independent eyewitness to the fight that night and the physical evidence presented by the State and by Bennett did not establish, and at best was inconclusive, as to the identity of the initial aggressor. Tr. Trans., vol. 5, p. 109, ln. 11–21; p. 159, ln. 13–19. Therefore, evidence establishing Mulvey was the initial aggressor and Tenny possessed a reasonable apprehension of imminent death or serious bodily injury is the only evidence which could have persuaded the jury to accept Tenny's defense of self-defense, and to persuade the sentencing judge to accept Tenny's defense of sudden passion. November 13, 2002, Hearing Transcript ("Hearing Trans."), p. 55, ln. 11–17; Tr. Trans., vol. 5, p. 109, ln. 11–21; p. 159, ln. 13–19.

### Testimony Not Presented

In the days immediately preceding Mulvey's death, from May 9 to May 12, 1997, Mulvey's behavior spiraled out of control. Mulvey repeatedly told a number of different persons she intended to kill, or otherwise harm, Tenny. June 29, 2000, Dr. William Penn Affidavit ("Dr. Penn Aff.") at 2; June 17, 2000, Florence Dente Parker Affidavit ("Parker Aff.") at 2; June 17, 2000, Father Benedict Affidavit, ("Father Benedict Aff.") at 3; July 10, 2000, Father Jeremiah Affidavit ("Father Jeremiah Aff.") at 3. Mulvey repeatedly threatened to burn down their house. Parker Aff. at 2; Father Jeremiah Aff. at 3; June 19, 2000, Joseph Swift Affidavit ("Swift Aff.") at 1. Mulvey also threatened to burn down the Christ of the Hills Monastery where she worked. June 17, 2000, Mother Seraphima Affidavit ("Mother Seraphima Aff.") at 2; Father Jeremiah Aff. at 3. Mulvey was distraught over her financial circumstances, yet she quit her job, her only source of income, on Monday, May 12th, the day of her death. Father Jeremiah Aff. at 2–4. On the day of her death, Mulvey approached a virtual stranger requesting he co-sign a $100,000 loan on her behalf. Swift Aff. at 1.

Tenny was aware Mulvey's behavior was becoming increasingly irrational and violent. Three days prior to Mulvey's death, Mulvey threw a chair at Tenny, poked him in the chest with a knife, and continued her violent behavior by destroying their property. Dr. Penn Aff. at 2; Father Benedict Aff. at 3. On the evening of Mulvey's death, while Tenny was packing his belongings to move out, Tenny received two specific warnings to leave the house from concerned friends, because Mulvey had told them that day, she was going to kill Tenny, burn down the house, and then bury Tenny in the yard. Father Benedict Aff. at 4–5; Father Jeremiah Aff. at 4. Tenny was also aware Mulvey bragged that she had stabbed her previous husband. Tenny argues none of this evidence was ever presented to the jury, who found Tenny guilty of murder, or to the trial court that eventually sentenced Tenny to 65 years in prison.

## Analysis

### I. Grounds for Relief

In his habeas petition, Tenny presents the following grounds for relief:

(1) His counsel at trial was ineffective for failing to explore a valid defense, giving erroneous advice at sentencing, failing to make proper objections, and having a conflict of interest;

(2) The evidence was insufficient to support his conviction;

(3) The prosecutor at trial made an improper, highly prejudicial argument to the jury; and

(4) His appellate counsel rendered ineffective assistance because she failed to raise his grounds for error on appeal.

### II. Exhaustion

Respondent does not argue Tenny has not exhausted his state court remedies regarding the claims brought in this application. A review of the state court records submitted by Respondent shows Tenny has properly raised these claims in previous state court proceedings. However, during the November 13, 2002 evidentiary hearing, Tenny introduced several affidavits of potential witnesses that had not been presented to the state court during the state habeas proceedings. Respondent argues these affidavits should not be considered by this Court because the state habeas court did not have an opportunity to consider them.

■ The Fifth Circuit has repeatedly made clear a state prisoner must present his claims to a state tribunal, and thereby exhaust his state remedies, before filing a habeas petition in federal court. *Ogan v. Cockrell*, 297 F.3d 349, 356 (5th Cir.2002).

A habeas petitioner has failed to exhaust his state court remedies when he presents his claims to the federal court "in a significantly different and stronger evidentiary posture than [they were] before the state courts." *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir.2000) (internal quotation marks omitted).

The Fifth Circuit's case law suggests Tenny has failed to exhaust his state court remedies. In *Brown v. Estelle*, 701 F.2d 494 (5th Cir.1983), the Fifth Circuit considered a situation very similar to the instant case. The petitioner in *Brown* based both his state and federal habeas petitions on claims of ineffective assistance of counsel, contending trial counsel should have been on notice of facts sufficient to support an insanity defense. In state court, the petitioner detailed facts in his petition showing he had exhibited "extremely bizarre and violent behavior" while in jail awaiting trial. As a result, he was committed to a mental hospital where he had been diagnosed as schizophrenic. Upon returning to jail, he received substantial doses of anti-psychotic drugs. In his subsequently filed federal habeas petition, the petitioner asserted the same general theory for his ineffective assistance claim, but added three affidavits of individuals who had observed petitioner's behavior. Because the claim of ineffective assistance was "significantly different and stronger" than that presented to the state court, the Fifth Circuit held his claim was not exhausted and that his claim required further proceedings in state court. *Id.* at 496.

In support of this petition, Tenny offers the declarations of Rebecca Silvernail, Edwin Tenny, Wallace Brown, Loren Marshall, and Steven Becker. This evidence was never presented to the Texas state courts for consideration.[1]

---

1. When Tenny filed his state habeas petition, he presented six affidavits from potential wit-

Rebecca Silvernail ("Silvernail"), a former employer of Mulvey, had many occasions to observe Mulvey's behavior and personality. November 13, 2002, Declaration of Rebecca Silvernail ("Silvernail Dec.") at 1. Silvernail described Mulvey as aggressive and prone to losing "her temper quickly and many times over little things." Silvernail Dec. at 1. Silvernail found Mulvey to be irrational at times and believed Mulvey "took pride in being confrontational." Silvernail Dec. at 1-2. Mulvey bragged to Silvernail that she "took the bull by the horns and stabbed him" when her previous husband angered her. Silvernail Dec. at 2. Silvernail declares Tenny's counsel never contacted her.

Initially, Bennett denied having any knowledge of the probative nature of Silvernail's testimony. Hearing Trans., p. 67, ln. 1-5. However, his notes included Silvernail's underlined name with the notations "good friends" and "previously stabbed husband in California," and contact information. Hearing Trans., p. 67, ln. 1—p. 68, ln. 2. Bennett admitted his only effort to locate Silvernail was an unsuccessful phone call. Hearing Trans., p. 69, ln. 5-19. In addition, Bennett admitted he failed to assign his private investigator the task of locating Silvernail. Hearing Trans., p. 126, ln. 4-13. Nonetheless, Bennett acknowledged:

Q. [Sheppard] Do you think it would be important evidence in a self-defense case where self-defense is that she attacked him with a knife, that she had bragged about stabbing her previous husband -

A. [Bennett] Oh, absolutely, yes.

Hearing Trans., p. 69, ln. 15-19. Contrary to Respondent's post-hearing brief, Bennett never testified that Tenny asked counsel to discontinue looking for Silvernail.

Edwin Tenny, Petitioner's father, attested to the fact that Mulvey called him at his son Patrick's house in Missouri the day before her death. Edwin Tenny asserted he had met Mulvey before, but he had never received a phone call from her. According to Edwin Tenny, the phone call lasted 45 minutes. Edwin Tenny described Mulvey as extremely agitated and distraught. Edwin Tenny stated Mulvey was upset with Petitioner because he wanted his son to move in with them and Mulvey was convinced she would have to raise Tenny's four boys. According to Edwin Tenny, Mulvey threatened to have her son in California come and beat Tenny up if Tenny tried to get custody of any of his kids. Although Edwin Tenny attempted to calm Mulvey, he was unsuccessful. Mulvey ended the conversation abruptly, still distraught, angry, and disoriented. Edwin Tenny asserts he informed Bennett of his conversation with Mulvey and expressed his willingness to testify at trial. Bennett did not call Edwin Tenny as a witness during the guilt/innocence phase of the trial before the jury. Instead, he called Edwin Tenny during the sentencing phase before the judge. Edwin Tenny states Bennett did not ask him any questions about his telephone conversation with Mulvey.

Wallace Brown ("Brown") attests in his affidavit that he resides in St. Anna's Elder Haus located at the Monastery where Mulvey worked. November 12, 2002, Declaration of Wallace Brown ("Brown Dec.") at 1. Brown knew Mulvey to possess great physical strength. Brown Dec. at 1. In addition, Brown believed Mulvey to be "in-

nesses he contended counsel should have called to testify. The original six affidavits were from witnesses Father Jeremiah, Father Benedict, Dr. Penn, Joseph Swift, Florence Parker, and Mother Seraphima.

sane" and "nuts", often exhibiting irrational behavior. Brown Dec. at 2. According to Brown, he saw Mulvey the day of her death. Brown states he remembers she was in a bad mood and worked up over something. Brown also asserts he was never contacted by Bennett.

Loren Marshall ("Marshall") indicated he had given his statement to the Blanco County Sheriff's Office. According to Marshall, on the day of Mulvey's death, Mulvey came to the bank where Marshall worked, complaining Tenny wanted to move his four boys into their home. Marshall indicated Mulvey stated she had already raised her family and she did not want to raise another due to her age (60 years). Mulvey allegedly informed Marshall that Tenny had given her an ultimatum, to move or to give him $3,000 for his share of the equity in the double-wide trailer in which they lived. Marshall asserts Mulvey claimed to have no money or place to go. According to Marshall, he suggested to Mulvey that she seek legal advice from Dean Myane, a female attorney in town. Marshall asserts he was under the impression Mulvey was going to see Myane after leaving the bank. Despite giving his statement to the Blanco County Sheriff's Office, Marshall asserts Bennett never contacted him.

Steven Becker ("Becker"), owner of a restaurant Mulvey visited on the day of her death, attests Mulvey had a drink and made two or three phone calls from the restaurant. Becker described Mulvey's behavior as spooky and weird, and her mannerisms as impatient and distraught. According to Becker, he gave a statement to the Blanco County Sheriff's Office shortly after Mulvey's death. Despite the statement, Bennett never contacted Becker.

Clearly, the evidence presented to this Court constitutes stronger evidence than the evidence Tenny offered to the state court. For example, Tenny raises for the first time the alleged conversation Mulvey had with Tenny's father the day before the murder, regarding Tenny's children, and Mulvey's spooky and weird demeanor in a restaurant prior to her death. As a result, Tenny's claims are presented to this Court in a "significantly different and stronger evidentiary posture" than in the state court. Therefore, this Court agrees with the Magistrate Judge's conclusion that Tenny's claims relying on the new affidavits are unexhausted.

 If a petitioner's unexhausted claims would be procedurally barred under state law, a federal court must dismiss those claims with prejudice. *Fuller v. Johnson*, 158 F.3d 903, 905–06 (5th Cir. 1998). Tenny is prevented from raising his unexhausted claims in a subsequent state habeas petition by Texas's abuse of the writ doctrine. This doctrine "prohibits a second habeas petition, absent a showing of cause, if the applicant urges grounds therein that could have been, but were not, raised in his first habeas petition." *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (citing *Ex parte Barber*, 879 S.W.2d 889, 891 n. 1 (Tex.Crim.App.1994)); *see* Tex. Crim. Proc. Code Ann. art. 11.071 § 5(a).

 Because the Texas abuse of the writ doctrine prevents Tenny from presenting the unexhausted claims in any subsequent state habeas petition, those claims are procedurally defaulted for purposes of federal habeas review. *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir.2001). Therefore, unless Tenny qualifies for an exception to the procedural default rules, those claims cannot provide a basis for federal habeas relief herein. *See Ogan*, 297 F.3d at 356. A petitioner can overcome a procedural default only if he can (1) demonstrate cause for the default and (2) demon-

strate actual prejudice resulting from the alleged violation of federal law. *Id.*

■ Tenny argues the procedural default of these claims is the result of the state habeas court's failure to conduct an evidentiary hearing or provide for other discovery mechanisms. Tenny compares his case to *Strickler v. Greene,* 527 U.S. 263, 283, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), a case in which the petitioner alleged a *Brady* violation. However, in *Strickler* the petitioner had difficulty in discovering the factual basis of his claim because the exculpatory evidence was allegedly concealed from him by the prosecution, *not* the trial court. Moreover, the necessity of an evidentiary hearing was an initial decision to be made by the state convicting court in the exercise of its sound discretion. *Ross v. Estelle,* 694 F.2d 1008, 1012 n. 2 (5th Cir.1983) (citing Tex. Code Crim. Pro. art. 11.07 § 2(d); *Ex Parte Young,* 418 S.W.2d 824 (Tex.Cr.App. 1967)). As the Magistrate Judge noted, Tenny cannot argue he could not have obtained his father's affidavit without the help of the trial court nor has he shown he was prevented from alleging in his state application Mulvey told Silvernail that she had stabbed her previous husband. Accordingly, the lack of an evidentiary hearing or other formal discovery at the state court does not constitute cause for Tenny's failure to specifically present the factual basis of his claims to the state habeas court.

■■ In the further alternative, Tenny asserts he is exonerated from procedural default under the "miscarriage of justice" exception. The miscarriage of justice exception to the procedural default doctrine requires " 'factual innocence and not mere legal insufficiency.' " *United States v. Jones,* 172 F.3d 381, 384 (5th Cir.1999) (quoting *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)). To establish the requisite probability he was actually innocent, Tenny must support his allegations with new, reliable evidence that was not presented at trial and must show it was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence. *See id.* at 324, 115 S.Ct. 851. A showing of facts which are highly probative of an affirmative defense, which if accepted by a jury would result in the defendant's acquittal, constitutes a sufficient showing of "actual innocence" to exempt a claim from the bar of procedural default. *Finley v. Johnson,* 243 F.3d 215 (5th Cir.2001).

Tenny's new evidence consists of the five new affidavits discussed above. While these affidavits are probative of Tenny's claim of self-defense, the Magistrate Judge correctly noted the State has not had the opportunity to dispute the information contained in these affidavits and no court has made any credibility determinations with regard to these witnesses. Under these circumstances, the Court must hold Tenny had not made a sufficient showing of "actual innocence" to satisfy the fundamental miscarriage of justice exception. Accordingly, the Court will not consider the declarations of Silvernail, Edwin Tenny, Brown, Marshall, and Becker.

### III. Standard for Review under AEDPA

■ Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a state prisoner's federal habeas petition as to any

claim addressed by the state courts on the merits only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Brown v. Cain,* 104 F.3d 744, 749 (5th Cir.1997), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997). The state court's application of clearly established federal law must be "unreasonable," not merely erroneous or incorrect. *Williams v. Taylor,* 529 U.S. 362, 389, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

With respect to fact findings made by state courts, this Court must presume the state court's determination of a factual issue is correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Where the petitioner has failed to develop the factual basis of a claim in state court, the petitioner may not present additional factual evidence on that issue unless his claim falls within the narrow exceptions of 28 U.S.C. § 2254(e)(2):

 (A) the claim relies on -

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*See, e.g., Hernandez v. Johnson,* 108 F.3d 554 (5th Cir.1997), *cert. denied,* 522 U.S. 984, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997).

## IV. Ineffective Assistance of Trial Counsel

Tenny argues he was denied effective assistance of trial counsel. Specifically, Tenny claims his counsel was ineffective for failing to explore a valid defense, giving erroneous advice at sentencing, failing to make proper objections, and having a conflict of interest. Tenny raised these same issues in his supplemental appellate brief and his state application for habeas corpus relief. Tenny's ineffective assistance argument was rejected by the state habeas court. Thus, this Court may only grant Tenny federal habeas relief if Tenny establishes by clear and convincing evidence the state habeas court's decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established federal law" at the time; or was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d); *see also Brown v. Cain,* 104 F.3d 744, 749 (5th Cir.1997), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997).

To establish a cognizable ineffective assistance of counsel claim, a petitioner must meet both prongs of the well-settled *Strickland v. Washington* test. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Tenny must prove (1) counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *See, e.g., Boyle v. Johnson,* 93 F.3d 180 (5th Cir.1996). To meet the first prong, Tenny must show counsel's conduct fell beneath an objective standard of reasonable professional assistance that effectively denied petitioner effective counsel as required by the Sixth Amendment. *United States v. Haese,* 162 F.3d 359 (5th Cir.1998), *cert.*

*denied,* 526 U.S. 1138, 119 S.Ct. 1795, 143 L.Ed.2d 1022 (1999). For the second prong, Tenny must show, but for counsel's deficient conduct, the result of the proceeding would have been different. *Id.* at 364. Of course, the Court must make a fair assessment of counsel's performance, and not let its analysis be prejudiced by unreasonable second-guessing or hindsight.

Respondent contends Bennett's actions were the product of trial strategy. When evaluating ineffective assistance of counsel claims, courts must defer to attorneys' strategic decisions: "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. In other words, attorneys have a duty to conduct a reasonable investigation into mitigating evidence, and the court must determine "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable.*" *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) (emphasis in original). If the investigation into mitigating evidence was reasonable under prevailing professional norms, the strategy developed from the results of the investigation deserves deference.

## A. Self–Defense Claim

■ Tenny argues his trial counsel abdicated his role as defense counsel when he failed to investigate and call highly relevant and known witnesses, and failed to develop the relevant and critical testimony of witnesses he did call. The state habeas

court did not order Bennett to provide an affidavit explaining his failures. As explained *supra,* the Magistrate Judge held an evidentiary hearing on this matter on November 13, 2002, at which Bennett testified. At the hearing, Bennett admitted self-defense was the only complete defense available to Tenny:

Q. [Sheppard] Now, is there any doubt in your mind that the only viable defensive strategy in this case was one of self-defense?

A. [Bennett] That's the only one that Mr. Tenny wanted to pursue.

Q. Did you, as an attorney, see any other viable strategy of defense other than self-defense?

A. I think aggravated assault was a viable strategy of defense if self-defense were to fall by the wayside.

Hearing Trans., p. 55, ln. 11–17. Other than self-defense, Bennett's only concept of a defense was aggravated assault, a lesser included offense with a serious penalty. Essentially, Bennett thus conceded self-defense was Tenny's only defense. Yet, astoundingly, Bennett failed to elicit any critical testimony supporting Tenny's sole defense.

In support of this claim, Tenny presents the affidavits of Father Jeremiah, Father Benedict, Dr. William Penn, Joseph Swift, Florence Parker, and Mother Seraphima. These affidavits were presented to the state court and may, therefore, be considered here.

### 1. Specific Examples of Bennett's Failure to Investigate

Bennett failed to investigate, or otherwise assess the probative value of testimony offered by Florence Parker and Mother Seraphima.[2] Florence Parker, a resident

---

**2.** Indeed, despite the fact Bennett knew Mul-

vey worked at the Monastery as an attendant

at the Elder Haus, was in almost daily contact with, and had ample opportunity to observe, Mulvey both prior to and on the day of her death. Parker would have testified Mulvey possessed surprising physical strength, was unreasonably critical and engaged in child-like antics when her caregiving was questioned. Parker Aff. at 1–2. Significantly, on the day of Mulvey's death, Mulvey told Parker "[s]he would kill Jim and burn the house down before she would have any of his kids come stay or live there, or his change the status quo in any way." Parker Aff. at 2. This information was communicated to Bennett prior to trial. Parker Aff. at 2; Hearing Trans., p. 59, ln. 8–19. Despite the potential value of Parker's testimony, Bennett testified:

> Q. [Sheppard] So you had not interviewed [Parker] at all or made, really, any attempt to interview her?
>
> A. [Bennett] No, I had not.
>
> Q. Or obtain her testimony?
>
> A. No.

Hearing Trans., p. 59, ln. 20–24. Parker was expressly identified by police records as a person having relevant knowledge.

Bennett claimed he did not interview Parker because he believed she was incompetent. Hearing Trans., p. 58. However, having never interviewed Parker, Bennett was in no position to abandon such a highly relevant witness whose testimony was crucial to Tenny's claim of self-defense. Furthermore, Bennett's notes and related testimony specifically state Parker was competent:

> Q. [Sheppard] If you would, sir, please turn to page 21, the middle of the page, and you see, in fairly large handwriting, underlined the words "Florence Parker"?

at the Elder Haus, Bennett never interviewed or investigated the very people who had daily

> A. [Bennett] I do.
>
> Q. And the notes read ... '70's, dash, fully competent, dash and then, again aunt, and then, something about taped the windows with newspaper?
>
> A. Exactly.
>
> Q. All right. So in your notes, you have that you were told, ... [by] some source of information that while she was in her '70's, she was fully competent. Is that what your notes say?
>
> A. Yeah ...
>
> Q. This is well before the trial?
>
> A. This is, like, I want to say, August or September of 1997.
>
> Q. So at that time, when you had almost two years to interview her, you had information ... [c]ontrary to what you said earlier, your notes indicate that you were told she was fully competent and that you did not interview her at any time?
>
> A. That's right, yes.

Hearing Trans., p. 62, ln. 24—p. 63, ln. 25; Bennett Notes at 21. Accordingly, the explanation provided by Bennett for ignoring Parker and her testimony is not credible.

Mother Seraphima would have also testified to Mulvey's strength. Mother Seraphima attributed Mulvey's strength to her experiences restraining mental patients. Mother Seraphima Aff. at 1–2. Mother Seraphima believed Mulvey could throw almost any grown man to the ground. Mother Seraphima would also have testified she spoke with and observed Mulvey hours before her death, and found her to be "absolutely out of control" and "in a rage." Mother Seraphima Aff. at 2. That

contact with Mulvey.

same day Mother Seraphima saw Mulvey assault Father Jeremiah and overheard her threaten to "burn the Monastery down" as well as "do even more than that . . . she was going to do something that would hurt us for the rest of our lives." Mother Seraphima Aff. at 2.

Bennett claims he did not interview Mother Seraphima because he simply did not know she had any significant information to offer. Yet, when questioned about the purpose of interviewing witnesses, Bennett agreed it is true the purpose of interviewing witnesses is to determine what they know. Hearing Trans., p. 66, ln. 2–4. Therefore, Bennett's decision not to interview Mother Seraphima and assess the value of her testimony was not reasonable.

## 2. Specific Examples of Bennett's Failure to Call Witnesses or Elicit Testimony from Witnesses Possessing Highly Critical Factual Evidence

Bennett also failed to call or elicit material testimony from Father Jeremiah, Father Benedict, Dr. William Penn, Joseph Swift, and Tenny himself. Father Jeremiah was Mulvey's supervisor at the Elder Haus. He avers he would have testified Mulvey was prone to "fly into insane rages" and had demonstrated violent tendencies. Father Jeremiah Aff. at 2–3. Father Jeremiah further states two days prior to her death, Mulvey threatened Tenny by stating "I'm gonna kill that son of a bitch, bury him in the yard and burn the house down." Father Jeremiah Aff. at 3. According to Father Jeremiah, Mulvey stated, "I'm damn near 60 years old. I've raised my kids. I'm through raising kids. He thinks he can just bull me over and bring home one of his kids—just like that?! I'm not going to take it." Father Jeremiah Aff. at 2. Father Jeremiah would have

testified Mulvey was belligerent, illogical, and threatening to commit acts of arson on the day of her death. Father Jeremiah Aff. at 4. Father Jeremiah believed Mulvey was in dire need of professional psychiatric assistance. Father Jeremiah Aff. at 4.

Father Benedict would have testified Mulvey had a paranoid personality and was generally concerned "someone might be trying to 'get to her,' " Father Benedict Aff. at 2. Father Benedict was aware of the mounting instability within the Tenny household. He knew Mulvey had threatened to physically harm Tenny, had stabbed Tenny the Friday before her death, that Tenny believed Mulvey was "out of her mind," and Tenny was "frightened by the threat of violence." Father Benedict Aff. at 3. Father Benedict also had the opportunity to assess Mulvey's behavior on the day of her death and found her to be agitated, argumentative, and threatening. Father Benedict Aff. at 4. Indeed, on the night of Mulvey's death, Father Benedict warned Tenny of Mulvey's threats to kill him, and advised Tenny to leave their home. Father Benedict Aff. at 5.

Dr. William Penn, who testified at the trial, was prepared to testify to further facts. Specifically, Dr. Penn avers he was aware of the growing conflict between Mulvey and Tenny arising from Tenny's need to bring his son into their home. Dr. Penn Aff. at 1. Dr. Penn had agreed to provide a place on his ranch for Tenny's trailer so Tenny and his son could reside together. Dr. Penn Aff. at 1–2. Further, Dr. Penn would have testified Mulvey had threatened Tenny with a knife. Dr. Penn Aff. at 1–2. After visiting Tenny in the hospital following the incident, Dr. Penn described Tenny's condition:

> [Tenny] looked like he had been run over by a threshing machine. His right eye was black and blue, his right ear cut,

and there was a tube coming out of his chest emptying blood from a punctured lung into a bag on the floor. It was clear that there had been a violent struggle in which [Tenny] had nearly lost his life.

Dr. Penn Aff. at 2. Dr. Penn would also have testified Tenny's account of the incident was consistent with the injuries he observed. Dr. Penn Aff. at 2.

Joseph Swift ("Swift") did testify that the morning of Mulvey's death, Mulvey had called in requesting a loan. However, additional information was left unsolicited by Bennett, including the fact that the loan amount was $100,000, the loan was necessary because Mulvey was ending her relationship with Tenny and she wanted to purchase the mobile homes as well as the property where the mobile homes were located. Swift Aff. at 1. Swift would have also testified Mulvey threatened " 'she would rather see all of it burned to the ground' before she would . . . let the creditors or Mr. Tenny have it." Swift Aff. at 1.

Tenny, himself, took the stand and testified regarding the events that occurred on May 12, 1997. Yet, Bennett failed to develop these critical facts from Tenny:

- On Friday, May 9, 1997, Mulvey became hysterical, threatened Tenny with violence, and poked him in the chest with a knife—the very same knife Mulvey later stabbed Tenny with on the night of her death.
- Tenny told both Dr. Penn and Father Benedict about the Friday, May 9, 1997 incident and showed them the knife marks on his chest.
- Tenny was aware Mulvey was making threats against his life and was behaving irrationally and erratically, thereby establishing his reasonable apprehension.

- Tenny knew Mulvey had stabbed her previous husband, further establishing his reasonable apprehension.

This testimony was clearly relevant to establish Tenny's entitlement to self-defense and Bennett admitted he had no reason for failing to seek this testimony:

Q. [Sheppard] Well, I tell you that in your opening statement there is no mention of it. And in Jim Tenny's testimony, cross, direct, redirect, re-cross, there is no mention by Jim Tenny or [by] you in opening or closing or anywhere in this trial, of that incident on Friday night where Joyce went out of control, broke furniture, broke the window, and threatened him with a knife. Also, there's no testimony about Jim telling anybody about that later. What was your calculated trial strategy to justify leaving that evidence out?

A. [Bennett] I don't know.

Hearing Trans., p. 81, ln. 2–12.

### 3. Bennett's Failures Were Not Based Upon Sound Trial Strategy

### i. Bennett's Desire to Avoid Rebuttal State of Mind Testimony

Bennett explained he abandoned self-defense because he believed in bringing up Tenny's state of mind, he would open the door for the prosecution to bring in Mulvey's state of mind (that Mulvey was afraid Tenny was going to kill her). However, Mulvey's state of mind was already an issue because Tenny claimed Mulvey was the initial aggressor. *Tate v. State,* 981 S.W.2d 189, 192–93 (Tex.Crim.App.1998) (in self-defense cases, evidence of the victim's state of mind is admissible as long as it has relevance apart from character conformity). Furthermore, the State did bring in Mulvey's state of mind. *See, e.g.,* Tr. Trans., vol. 4, p. 132, ln. 7–12.

To make matters worse, when Bennett was questioned regarding the identity and availability of possible State witnesses to Mulvey's state of mind, Bennett could only identify two, Tonya Abers and Mulvey's unnamed sister. Hearing Trans., p. 118, ln. 18—p. 119, ln. 8. Incredibly, Bennett did not interview these possible State witnesses or otherwise investigate what admissible testimony they could provide. Hearing Trans., p. 119, ln. 18–19; p. 120, ln. 8–9. Neither Tonya Abers nor Mulvey's unnamed sister testified at Tenny's trial.

### ii. Bennett's Desire to Avoid the Monastery "Taint"

Additionally, Bennett claims his fear of bringing the Monastery "taint" into the trial justified his inaction. After Mulvey's death, Father Jeremiah and Father Benedict were indicted for what Bennett described as multiple counts of indecency with a child. Hearing Trans., p. 92. Overall, Bennett described the Monastery as having a poor reputation in the community. Hearing Trans., p. 92. However, Bennett maintained, in a motion for continuance filed on January 4, 1999, Father Benedict's testimony was important because:

[he was] a crucial fact witness.

\* \* \* \* \* \*

Father Benedict would testify ... [that Mulvey] made threats to Father Jeremiah that she planned to burn the defendant with gasoline, stab him, and bury him in the backyard, and he in turn told defendant of these threats.

\* \* \* \* \* \*

Father Benedict would also testify that he spoke to Joyce Mulvey on the date of her death, and, in his opinion, she was distraught and disoriented.

In a later motion for continuance filed on April 30, 1999, only two weeks prior to trial, Bennett explained:

[Father Benedict's] and [Father Jeremiah's] testimony is absolutely essential to the defense.

\* \* \* \* \* \*

It's no secret that our defense is justification.

\* \* \* \* \* \*

[Father Jeremiah] will testify that on the day of Joyce Mulvey's death ... Joyce Mulvey told him that she was going to kill Defendant, burn the house down and bury him in the yard.

\* \* \* \* \* \*

[Father Benedict] will testify that he told defendant of Mulvey's threats.

\* \* \* \* \* \*

[Father Benedict] will also testify that he spoke with Joyce Mulvey on the date of her death, and, in his opinion, she was distraught and disoriented, which is consistent with what the Defendant told the investigating officers at the hospital.

\* \* \* \* \* \*

Clearly, [Father Jeremiah's] and [Father Benedict's] testimony is probative as to the relevant facts and circumstances surrounding the killing, as well as the condition of the defendant's mind ... and to the crucial punishment issue of sudden passion arising from adequate cause—an issue in which the defendant is required to prove by a preponderance of the evidence.

\* \* \* \* \* \*

Should the Court deny this motion, the defendant ... will be forced to proceed to trial without the testimony of a crucial witness, thereby denying him his right to due course and due process of

law, as well as his right to procure testimony on his behalf.

After Father Jeremiah and Father Benedict had been indicted, Bennett chose not to call them as witnesses. In doing so, Bennett failed to consider or take advantage of the numerous mechanisms available for overcoming such prejudices. For example, moving for a change of venue, conducting *voir dire* of potential jurors to ascertain their knowledge and potential bias, or apprising himself of the rules of evidence available to prohibit the State's attempts to introduce this type of character evidence.[3] Bennett admitted at the evidentiary hearing the worse-case scenario in calling Father Jeremiah and Father Benedict to testify was the jury would not believe their testimony. Hearing Trans., p. 74, ln. 9–15.

In sum, Bennett had no legitimate reason for withholding the testimony of Father Jeremiah, Father Benedict, Dr. Penn, Joseph Swift, Florence Parker, and Mother Seraphima. Bennett's actions cannot be justified as reasoned or sound trial strategy because he failed to apprise himself of the law and the facts of Tenny's defense. *Moore v. Johnson,* 194 F.3d 586, 615 (5th Cir.1999) (court should defer to counsel's decision not to present mitigating evidence or not to present certain line of mitigating evidence when that decision is both fully informed and strategic, in sense that it is expected, on basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense; however, a court need not defer to decisions that are not informed by adequate investigation into controlling facts and law).

### 4. Bennett's Ineffectiveness Prejudiced Tenny

Bennett's many failures during the guilt/innocence phase of Tenny's trial clearly prejudiced Tenny's case. This Court's analysis reveals a reasonable probability, absent Bennett's obvious incompetence, the jury would have been presented with substantial and critical evidence supporting Tenny's claim to self-defense, and the jury could well have had a reasonable doubt of guilt. Accordingly, this Court finds Tenny was prejudiced.

Finally, this Court must determine whether the state habeas court's denial of Tenny's application was not only wrong, but unreasonable. It bears repeating the Texas Court of Criminal Appeals denied Tenny's application without written order based on the irrelevant skeletal findings of the trial court without a hearing.[4] In the state habeas court, there were no explicit factual findings regarding whether Bennett's performance was deficient and/or whether the performance prejudiced Tenny. While this Court must assume, pursuant to Fifth Circuit authority, the state habeas court made implied findings Bennett was not ineffective or that he was ineffective but his conduct was not prejudicial, this Court has independently reviewed the record and pertinent federal law and is persuaded the state habeas court's result was based on an unreasonable determination of the facts in light of the evidence and unreasonably applied clearly established federal law regarding Tenny's claim of ineffective assistance of counsel for all of the reasons stated *supra.* The state habeas court's denial of Tenny's applica-

---

**3.** Texas Rules of Evidence 608 and 609 prohibit inquiry by the prosecution into pending criminal charges.

**4.** The only finding made by the trial court was Bennett was made no offer of employment or

prospective employment, nor was there any conversation inducing any hope of employment, prior to the conclusion of the trial. *Ex parte Tenny,* Appl. No. 48,704–01, at 104.

tion is, quite simply, wrong and unreasonable in light of the clear and convincing evidence in this record that Bennett was constitutionally ineffective and prejudiced Tenny's right to competent counsel.

Respondent argues in his objections to the Magistrate Judge's Report and Recommendation the Magistrate Judge failed to properly apply the principles of the AEDPA in reaching the conclusion that Tenny's petition should be granted. However, under Respondent's strained interpretation of *Schaetzle v. Cockrell*, no federal district court, circuit court, nor even the United States Supreme Court would ever be able to grant a habeas petition when a state court denied habeas relief regarding ineffective assistance of counsel. 343 F.3d 440 (5th Cir.2003). The decision whether to grant federal habeas relief on an ineffective assistance of counsel claim must be dependent on the particular facts of each case.

In this case, even assuming the state court applied clearly established federal law, the facts presented by Tenny in his *pro se* petition and at the evidentiary hearing before the Magistrate Judge, provide no basis for a conclusion that the state court's ultimate decision was reasonable. Bennett knew, or should have known, the testimony available to him at trial was persuasive and critical to the defense of self-defense. Instead, Bennett left uninvestigated numerous witnesses and failed to present evidence from at least a half dozen witnesses, possessing critical testimony.

Further, Respondent complains the state court could have found Bennett's decisions were not deficient but rather were sound strategic choices. The Magistrate Judge and this Court have already

specifically addressed and rejected this proposition. A state habeas court could not reasonably find Bennett's decisions not to investigate and present critical evidence and testimony were strategic.

Finally, Respondent contends because Tenny and counsel agreed together to the exclusion of witnesses, such a decision was sound trial strategy. This argument, however, is unsupported by evidence. Moreover, the fact Tenny may have agreed to what he believed was sound legal advice from a competent attorney appointed by the court is not controlling. Bennett, being either non-informed or ill-informed on both the facts and the law in Tenny's case, was never in a position to advise Tenny on any *reasoned* trial strategy.

## B. Sudden Passion

Tenny argues Bennett's representation of him at sentencing was likewise deficient resulting in him being denied the right of effective assistance of counsel. Tenny explains counsel advised him to waive his right to a jury at sentencing to avoid a harsh sentence. However, Tenny asserts counsel failed to advise him of the issue of sudden passion as a mitigating circumstance. Tenny similarly argues counsel failed to object to the court's charge for failure to include the elements of sudden passion. Tenny also faults counsel for failing to present evidence during sentencing before the judge to raise the issue of sudden passion.[5]

Respondent insists Tenny's claim is without merit because trial counsel did argue sudden passion at sentencing. *See* Respondent's Brief at 10–12. However, merely uttering the words "sudden passion" does not advance the theory or make

---

**5.** Had Tenny proven sudden passion, his maximum sentence would have been 20 years.

*See* TEXAS PENAL CODE ANN. § 12.33, 19.02(d).

necessary proof materialize. Bennett re-offered the evidence presented during the guilt/innocence phase at sentencing. Hearing Trans., p. 127, ln. 2–11 and 15–24. Yet, the evidence offered at trial did not mention the earlier attack of Tenny by Mulvey or Mulvey's repeated threats of arson and murder against Tenny:

Q. [Sheppard] On that last point, Mr. Bennett, you have the—you re-urged the evidence that you were presented at guilt or innocence, but again, none of that evidence included any of these witnesses' testimony?

A. [Bennett] I think that's right.

Q. And, in fact, omitted Jim Tenny's potential testimony about the attack on him by Joyce the Friday night before?

A. Yes, it did.

Q. The judge never heard anything?

A. No, it wasn't presented; he didn't hear it.

Hearing Trans., p. 127, ln. 15–24. Despite the critical nature of this evidence, Bennett never presented clearly mitigating evidence, and thus, abandoned Tenny's sudden passion contention.

The sentencing of Tenny was by a visiting judge, as opposed to the jury. Tr. Trans., vol. 7, p. 72–74. Bennett had no trial strategy in deciding not to call witnesses and not to introduce evidence during the sentencing phase of Tenny's trial. Bennett's fears of Monastery taint were neither applicable nor reasonable at sentencing in light of the fact that the sentencing was done by a visiting judge. As Bennett admits, the judge acted as an impartial arbiter of the facts at sentencing and would not be swayed by community sentiment toward the Monastery:

Q. [Sheppard] Now, you've talked about, also, that your strategy was

you were so concerned about the community sentiment concerning all these many witnesses for the defense who were from the monastery that you just backed off and didn't present them at all at the guilt or innocence stage. But then, you didn't present any of those witnesses at the punishment stage either, did you?

A. [Bennett] No, I did not.

Q. Was it your thinking that the judge would have the same kind of prejudice and attitude about the monastery where he could not remove that from his mind and evaluate their testimony?

A. No, not at all.

Hearing Trans., p. 126, ln. 14—p. 127, ln. 1.

It is clear from the record Bennett was ineffective as counsel at sentencing for not actively advancing the theory of sudden passion and, instead, withholding relevant testimony available to Tenny—probative facts regarding both Tenny's and Mulvey's states of mind. Bennett's actions were unreasonable and unsound. *See Jones v. Thigpen*, 788 F.2d 1101, 1103 (5th Cir.1986) (failure to present mitigating evidence at sentencing was professionally unreasonable). Accordingly, as the Magistrate Judge concluded, there was no strategy in Bennett's decisions, much less any reasoned strategy.

Bennett's deficient performance at sentencing served to prejudice Tenny as the mitigating evidence available to be presented would have in reasonable probability resulted in a significantly less harsh sentence. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir.1993). Therefore, this Court finds the state court could not have rea-

sonably held that Tenny had constitutionally effective counsel.

## C. Failure to Object

■ Additionally, Tenny argues he was denied due process rights guaranteed by the Sixth and Fourteenth Amendments because Bennett was constitutionally ineffective in failing to object to the prosecution's improper arguments (*see* Section VI, *infra*) and move for a mistrial as a result of such improper comments. Having conducted a full review of the record in this case, this Court finds Tenny has not shown, but for his counsel's failure to object, the outcome of his case would have been different. Accordingly, the Court declines to find any basis for habeas on this issue.

## D. Conflict of Interest

■ Tenny contends he received ineffective assistance because his trial counsel was operating under a conflict of interest. Specifically, Tenny asserts his attorney accepted a job from the Blanco County District Attorney's Office soon after Tenny's conviction. According to Tenny, his counsel was hired as a special prosecutor to prosecute two of Tenny's main witnesses, Father Benedict and Father Jeremiah on unrelated charges. Tenny raised this claim in his application for state writ of habeas corpus, and the Texas Court of Criminal Appeals denied relief on this claim. *Ex parte Tenny*, Appl. No. 48,704–01, at 30. The state court based its decision on two affidavits prepared by prosecutors in the Tenny case, rebutting any claim of conflict of interest. *Ex parte Tenny*, Appl. No. 48,704–01, at 98–102. In District Attorney Sam Oatman's affidavit, the prosecutor states "[n]o offer of employment, or even interest in possibly employing Mr. Bennett, was communicated, discussed, or considered until after the

conclusion of Mr. Tenny's trial." *Ex parte Tenny*, Appl. No. 48,704–01, at 99–100. First Assistant District Attorney Tom Cloudt similarly avers Bennett was not hired until after Tenny's trial, and at no time prior to the conviction was any consideration given to employing Bennett. *Ex parte Tenny*, Appl. No. 48,704–01, at 108. After consideration of the affidavits, the state habeas court found no offer of employment or prospective employment, nor any conversation inducing any hope of employment, was made to Bennett, prior to conclusion of the trial. *Ex parte Tenny*, Appl. No. 48,704–01, at 104. Because Tenny has not produced any evidence otherwise, and the state court found the affidavits credible, this Court agrees with the Magistrate Judge's determination the state court was not unreasonable in its application of clearly established federal law or in its determination of the facts in light of the evidence.

## V. Insufficient Evidence

Tenny contends his conviction is not supported by sufficient evidence because the evidence presented at trial proves he killed his common law wife, Mulvey, in self-defense. Tenny argues the evidentiary and testimonial evidence fully supports his claim of self-defense. Tenny raised this claim in his application for state writ of habeas corpus, and the Texas Court of Criminal Appeals denied relief on the claim. *Ex parte Tenny*, Appl. No. 48,704–01, at 11–14.

■ When deciding a federal habeas claim based on insufficient evidence, the Court decides whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The

evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt. *See United States v. Leahy*, 82 F.3d 624, 633 (5th Cir.1996).

 In this case, Tenny was charged with murder, which required the State to prove beyond a reasonable doubt Tenny committed assault and (1) intentionally or knowingly caused the death of an individual; (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of an individual; or (3) committed or attempted to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he committed or attempted to commit an act clearly dangerous to human life that caused the death of an individual. TEX. PENAL CODE ANN. § 19.02(b). Self-defense is an affirmative defense to murder. In Texas, a person is justified in using force against another when, and to the degree he reasonably believes, the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PEN. CODE ANN. § 9.31(a).

Tenny testified on his own behalf. On cross examination, the following exchange took place:

Q. [Prosecutor] You are James Bernard Tenny?

A. [Tenny] Yes.

Q. And you did intentionally and knowingly cause the death?

A. Yes, I did.

Q. Of Joyce Mulvey?

A. Yes, I did.

Q. By stabbing her in the chest and abdomen with a knife?

A. Yes, I did.

Tr. Trans., vol. 6, p. 94.

Tenny later explained further:

A. I, I may have had, gave you the wrong impression. When I shoved that knife into her, I shoved it into her with every bit of strength and every bit of power I had. She went down on the chair. I fell on top of her, basically pulling the knife to the side and I could feel it twisting inside of her as I was pushing it and my weight was going down on it, it was going sideways but it was in as far as it could go.

Tr. Trans., vol. 6, p. 96–97. After restating earlier testimony from the doctor who examined Mulvey's body, the prosecutor continued the questioning:

Q. [Prosecutor] Now, how did you—so you pulled it out of her at that time?

A. [Tenny] Yes.

Q. And you stabbed her again?

A. Yes.

Q. And you stabbed her again?

A. Yes.

Q. And you stabbed her again?

A. Yeah.

Tr. Trans., vol. 6, p. 96–97.

After viewing the evidence, as it stands in the record and in the light most favorable to the prosecution, this Court agrees with the Magistrate Judge and holds the evidence presented at trial was sufficient to permit a rationale finder of fact to find Tenny guilty of murder beyond a reasonable doubt, and therefore, Tenny is not entitled to habeas relief.

## VI. Prosecutorial Misconduct During Jury Argument

■ Tenny maintains the prosecutor made a number of improper remarks to the jury and he is therefore entitled to federal habeas relief. Specifically, Tenny argues the prosecutor stated in closing argument Tenny, after the incident, was "sloshing gas everywhere." Tr. Trans., vol. 6, p. 155. Tenny argues "[t]his baseless statement, combined with the prosecution's contention that the petitioner had over an hour to concoct his story and plant supporting evidence, prevented a fair trial. *See* Trial Trans., vol. 6, p. 159 (arguing '[a]fter an hour and eighteen minutes, [the petitioner] comes up with this.')." Petitioner's Objections at 10. Tenny notes, contrary to the prosecution's argument, the police arrived at the scene within seventeen minutes. Petitioner's Objections at 10. In addition, Tenny complains the prosecutor told the jury Tenny made several calls to 911 and it was during this period of time Tenny seized the opportunity to lay the groundwork for his defense. Tr. Trans., vol. 6, p. 151–54. Tenny also accuses the prosecutor of misstating the law contrary to the trial court's charge where the prosecutor told the jury, "whether it was justified or not, it's not your call" and "[i]f [Tenny] was in a rage, *he's not entitle[d] to self-defense.*" Tr. Trans., vol. 6, p. 165–166 (emphasis added).[6] The prosecution commenting on the jury charge, further instructed the jury:

> [t]here is not one single paragraph, word, or any issue of law in here that gives James Tenny the right to kill that woman because he was in a rage ... If he did that, then he is not in control of his faculties, that's for sure, but that he's not in the throws of self-defense. He's raging and killing someone because

he can't control himself and that's murder ...

Tr. Trans., vol. 6, p. 163.[7] Tenny argues the cumulative impact of these misstatements of the law by the prosecution, as well as the prosecution's factually inaccurate account of the events, so contaminated the trial and the jury's understanding of the law and facts that an unjust, and constitutionally unfair conviction was the result. As such, Tenny maintains the prosecutor's misstatements of fact and law were an egregious display of prosecutorial misconduct. The Texas Court of Criminal Appeals denied relief on this claim. *Ex parte Tenny*, Appl. No. 48,704–01, at 15–21.

■ A federal habeas court's ability to review the propriety of a prosecutor's jury argument is quite limited in cases where the allegedly problematic jury argument does not implicate one of the specific guarantees of the Bill of Rights such as the right against self-incrimination. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In fact, according to the Fifth Circuit, "[t]he prosecutor's remarks do not present a claim of constitutional significance unless they were so prejudicial that [the petitioner's] state court trial was rendered fundamentally unfair within the meaning of the fourteenth amendment." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985). Such unfairness exists only where the "prosecutor's remarks evince 'either persistent and pronounced misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Id.* (quoting *Fulford v. Maggio*, 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d

---

**6.** "There is no self-defense when she doesn't have the knife." Tr. Trans., vol. 6, p. 116.

**7.** There was no curative instruction by the court.

794 (1983)). Of course, in making their arguments to the jury, prosecutors are permitted to offer their interpretation of the evidence and suggest the fair inferences and conclusions they think the jurors should draw. *Dowthitt v. Johnson,* 230 F.3d 733, 755 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001).

As the Court explained *supra* (Section V), the evidence was not so insubstantial that, but for the prosecutor's remarks, no conviction would have occurred. In addition, Tenny's trial attorney reminded the jury to consider the evidence and not what the attorneys say. Tr. Trans., vol. 6, p. 127. Accordingly, this Court agrees with the Magistrate Judge that Tenny is not entitled to federal habeas relief on this basis.

## VII. Ineffective Assistance of Appellate Counsel

■■■ Tenny also contends he received ineffective assistance of counsel on appeal because his attorney failed to present all of his grounds of error to the court of appeals. Tenny's appellate counsel informed him by letter she had filed a brief in his case; but did not anticipate a favorable result. *See* Respondent's Answer, Exh. A at 10. Counsel stated she:

> read the Statement of Facts in your case very carefully, but found almost no preserved error in the record. This was due to several factors. First of all, the District Attorney tried a very clean case in as far as not attempting to enter legally questionable evidence. Second, your attorney made several objections to evidence which were sustained and objectionable evidence, therefore, was not admitted. Third, your attorney made few other objections to any evidence or to the charge or opening and closing arguments of the State. Without prop-

erly made objections, it is impossible to find error in the Reporters Record.

*Id.* A criminal defendant has a constitutional right to effective assistance of counsel in his first appeal as of right. *Hughes v. Booker,* 203 F.3d 894, 896 (5th Cir.2000). Tenny presented this claim in his application for state writ of habeas corpus, and the Texas Court of Criminal Appeals denied relief on the claim. *Ex parte Tenny,* Appl. No. 48,704–01, at 31–32, cover, respectively.

■■■ An appellate attorney is not required to raise every possible point on appeal, especially when the omitted points have no merit. *Sharp v. Puckett,* 930 F.2d 450, 452–53 (5th Cir.1991). As explained above, some of Tenny's claims regarding ineffective assistance of counsel have no merit. Those that are meritorious were not fully developed at the time of appeal. The proper avenue for pursuing those claims is in an application for habeas corpus relief, which Tenny, in fact, filed. Tenny has failed to demonstrate his appellate counsel was deficient for not raising the additional grounds or he was prejudiced thereby.

Having independently reviewed the state court record, the Court finds the state court's application of clearly established federal law and determination of facts in light of the evidence were not unreasonable. Accordingly, Tenny is not entitled to habeas corpus relief on his claim he received ineffective assistance of appellate counsel.

### Conclusion

Having conducted a *de novo* review of the facts and law presented in this matter:

IT IS ORDERED that the Report and Recommendation of the United States Magistrate Judge [# 42] is ACCEPTED to the extent consistent with this opinion; and

IT IS FURTHER ORDERED that Petitioner James B. Tenny's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[# 1] is GRANTED, and the State shall give James B. Tenny a new trial within 90 days of the final judgment in this case or the Respondent shall release him from custody.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CAPELLE, United States Magistrate Judge.

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(d) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective January 1, 1994.

Before the Court are Petitioner's Application for Habeas Corpus under 28 U.S.C. § 2254 (Document 1); Respondent's Answer (Document 3); Petitioner's response thereto (Document 4); Petitioner's Proposed Findings of Fact and Conclusions of Law (Document 36); Petitioner's Memorandum in Support thereof (Document 37); Respondent's Post–Hearing Brief(Document 40); and Petitioner's Reply (Document 41). At the time he filed his application for habeas corpus relief Petitioner was proceeding pro se and he had paid the filing fee for his application. After consideration of the application, Respondent's answer and Petitioner's response, the Court determined an evidentiary hearing was necessary and that the petitioner was indigent. Accordingly, the Court appointed counsel to represent the petitioner. For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be granted.

## STATEMENT OF THE CASE

### A. Petitioner's Criminal History

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 33rd Judicial District Court of Blanco County, Texas, styled *The State of Texas v. James Bernard Tenny.* On July 30, 1997, Petitioner was indicted on one count of murder with a deadly weapon. Petitioner pleaded not guilty to the charge and on May 14, 1999, he was convicted by a jury and sentenced to 65 years imprisonment.

Petitioner appealed his conviction, alleging through appellate counsel, that a shower scrubber had been improperly admitted into evidence. Petitioner also sent a pro se supplemental brief to the appellate court, alleging his counsel at trial and on appeal rendered ineffective assistance, the evidence was insufficient to support his conviction, and the prosecutor made improper, prejudicial arguments to the jury. The court of appeals received Petitioner's brief but did not file it. On August 31, 2000, the court of appeals affirmed Petitioner's conviction in an unpublished opinion. Petitioner did not file a petition for discretionary review.

On December 18, 2000, Petitioner filed a state application for habeas corpus relief, raising the same claims raised in his unfiled supplemental appellate brief. *Ex parte Tenny,* Appl. No. 48,704–01, at 3–38. On April 11, 2001, the Texas Court of Criminal Appeals denied his application without written order on the findings of the trial court without a hearing. *Id.* at cover.

Although it is not clear from the record, the trial court apparently ordered the State to file affidavits in response to Peti-

tioner's state application for habeas corpus relief. *Id.* The affidavits relied upon by the State were from Sam Oatman, District Attorney for the 33rd Judicial District of Texas, and Tom Cloudt, First Assistant District Attorney for that district. *Id.* at 99–102. The only issues discussed in the affidavits were with regard to Petitioner's claim that trial counsel, John Bennett, had a conflict of interest in that he was hired by the District Attorney shortly after Petitioner's trial concluded. *Id.* The only finding made by the trial court was that no offer of employment or prospective employment, nor any conversation inducing any hope of employment, was made to Bennett prior to conclusion of trial. *Id.* at 104. The trial court concluded Petitioner's allegation of a conflict did not form the basis for a claim of ineffective assistance of counsel. *Id.* The State and the trial court completely ignored the remainder of Petitioner's claims. As is typical, the Texas Court of Criminal Appeals simply denied Petitioner's written order on the skeletal findings of the trial court without a hearing. *Id.* at cover. Because of the poor review given by the state court and a multitude of unresolved factual issues, the Court, on November 13, 2002, held an evidentiary hearing in this case.

**B. Factual Background**

Petitioner asserts on May 12, 1997, after having gasoline thrown in his face, having avoided being set on fire because the cigarette lighter in Joyce Mulvey's hand failed to light, having been smashed on the head with a platter and then repeatedly attacked and stabbed with a knife, he caused the death of his common-law wife, Joyce Mulvey, in defense of himself. Petitioner contends his sole defense at trial was self-defense. He asserts there were no independent eyewitnesses to the events that night and the forensic evidence was inconclusive as to who was the aggressor.

Therefore, he concludes evidence establishing that Mulvey was the initial aggressor and that Petitioner possessed a reasonable apprehension of imminent death or serious bodily injury is the only evidence which could have persuaded the jury to accept Petitioner's defense of self-defense and to persuade the sentencing judge to accept Petitioner's defense of sudden passion.

At the evidentiary hearing, the Court was presented with evidence that in the days immediately preceding her death, from May 9 to May 12, Mulvey's behavior spiraled out of control. She repeatedly threatened to kill, or otherwise harm, Petitioner. She repeatedly threatened to burn down their home and the Monastery where she worked. The evidence indicated Mulvey was distraught, even frantic, over her financial circumstances, yet she quit her job, her only source of income, on the day of her death. Mulvey even asked a virtual stranger, that same day, to co-sign a $100,000 loan on her behalf.

The evidence indicated Petitioner knew Mulvey's behavior was becoming increasingly irrational and violent. In fact, three days prior to her death, Mulvey threw a chair at Petitioner, poked him in the chest with a knife and continued her violent threats against him by destroying their property. On the evening of her death, Petitioner received warnings from several concerned friends regarding Mulvey's stated plan to kill him, burn the house down and then bury him in the yard. They warned him to move out of the house. Petitioner was also aware Mulvey bragged she had stabbed her previous husband. Petitioner argues none of this evidence was ever presented to the jury, who found Petitioner guilty of murder, or to the trial court that eventually sentenced him to 65 years in prison.

## C. Petitioner's Grounds for Relief

Petitioner raises the following grounds for relief:

1. His counsel at trial was ineffective for failing to call defense witnesses, failing to make proper objections, failing to explore a valid defense, giving erroneous advice at sentencing and having a conflict of interest in the case;

2. The evidence was insufficient to support his conviction;

3. The prosecutor at trial made an improper, highly prejudicial argument to the jury; and

4. His appellate counsel rendered ineffective assistance because she failed to raise his grounds for error on appeal.

## D. Exhaustion of State Court Remedies

Respondent does not contest that Petitioner has exhausted his state court remedies regarding the claims brought in this application. A review of the state court records submitted by Respondent shows that Petitioner has properly raised these claims in previous state court proceedings.

During the evidentiary hearing, Petitioner introduced several affidavits of potential witnesses that had not been presented to the state court during the state habeas proceedings. Respondent argues these affidavits should not be considered by the Court because they are unexhausted.

## *DISCUSSION AND ANALYSIS*

## A. Exhaustion

The first issue this Court must resolve is whether Petitioner has exhausted his state court remedies in light of the new affidavits presented at the evidentiary hearing. In his state and federal applications for habeas corpus relief Petitioner presented six affidavits from potential witnesses he contended counsel should have called to testify. The original six affidavits were from witnesses Father Jeremiah, Father Benedict, Mother Seraphima, Florence Parker, Dr. William Penn, and Joseph Swift.

At the evidentiary hearing, Petitioner presented the Court with an additional five affidavits. *See* Petitioner's Exhibit 2. The new affidavits are from witnesses Rebecca Silvernail, Loren Marshall, Edwin Tenny, Vincent Steven Becker and Wallace Brown.

Silvernail indicates she would have testified she hired Joyce Mulvey in 1992 to 1993 and knew her to be aggressive and quick-tempered. Mulvey allegedly told her no one was going to get the best of her. While working for Silvernail, Mulvey allegedly told her she had stabbed her husband when she lived in California. Silvernail indicated she said this with a great deal of pride and a smile on her face. Mulvey allegedly told Silvernail her husband had provoked her and she "took the bull by the horns and stabbed him." Silvernail declares Petitioner's counsel never contacted her. Initially, counsel denied having any knowledge of the probative nature of Silvernail's testimony. [Hearing Tr., p. 67, ln. 1–5]. However, counsel's notes indicate differently. Specifically, the notes include Silvernail's underlined name with the notation good friends and previously stabbed husband in California and included a phone number. [Hearing Tr., p 67, ln. 9–18]. Despite acknowledging Silvernail's testimony would have been of great importance with respect to proving self-defense, counsel admitted he took no steps in locating Silvernail with the exception of making an unsuccessful phone call. [Hearing Tr., p. 69, ln. 5–19]. In addition he admitted he failed to assign his private

investigator the task of locating Silvernail. [Hearing Tr., p. 126, ln. 4–13]. Contrary to Respondent's post-hearing brief, counsel never testified that Petitioner asked counsel to discontinue looking for Silvernail and her husband.

Marshall indicated he had given his statement to the Blanco County Sheriff's Office which provided, on the day of Mulvey's death, she came to the bank in which he worked complaining Petitioner wanted to move his four boys into their home. According to Marshall, Mulvey stated she had already raised her family and she did not want to raise another due to her age (60 years). She allegedly informed Marshall that Petitioner had given her an ultimatum, to move or to give him $3,000 for his share of the equity in the double-wide trailer in which they lived. Marshall asserts Mulvey claimed to have no money or place to go. According to Marshall, he suggested to Mulvey that she seek legal advise from Dean Myane, a female attorney in town. Marshall asserts he was under the impression Mulvey was going to see Myane after leaving the bank. Despite giving his statement to the sheriff's office, Marshall asserts Bennett never contacted him.

Edwin Tenny, Petitioner's father, attested to the fact that Mulvey called him at his son Patrick's house in Missouri the day before her death. Edwin asserted he had met Mulvey before but he had never received a phone call from her. According to Edwin, the phone call lasted 45 minutes. Edwin described Mulvey as extremely agitated and distraught. He stated Mulvey was upset with Petitioner because Petitioner wanted his son to move in with them and she was convinced she would have to raise Petitioner's four boys. According to Edwin, Mulvey threatened to have her son in California come and beat Petitioner up if Petitioner tried to get custody of any of

his kids. Despite Edwin's attempts to calm Mulvey, he asserts he was unable and she ended the conversation abruptly, remaining distraught, angry and disoriented. Edwin asserts he informed Bennett of his conversation with Mulvey and expressed his willingness to testify at trial. Rather than calling Edwin during the guilt/innocence phase of trial before the jury, Bennett called Edwin during the sentencing phase before the judge. Edwin states Bennett did not ask him any questions about the telephone conversation.

Vincent Steven Becker, owner of a restaurant Mulvey visited on the day of her death, attests she had a drink and made two or three phone calls from the restaurant. Becker described her behavior as spooky and weird and her mannerisms as impatient and distraught. According to Becker, he gave a statement to the Blanco County Sheriff's Office shortly after Mulvey's death. Despite the statement, Bennett never contacted him.

And finally, Wallace Brown attests in his affidavit that he resides in St. Anna's Elder Haus located at the Christ of the Hills Monastery. Brown comments on the physical strength of Mulvey. He also characterizes Mulvey as insane and nuts. According to Brown, he saw Mulvey the day of her death. He states he remembers seeing her at the Monastery and she was in a bad mood and worked up over something. He also asserts he was never contacted by Bennett.

Because the new affidavits have never been presented to the state court for review, Respondent argues the additional claims made with regard to the affidavits are unexhausted. Petitioner responds he made the exact claims in his federal application as those he made in his state application. By introducing the new affidavits, Petitioner asserts he is not seeking to expand or deviate, to any substantial de-

gree, from the legal theories or the factual bases for relief presented to the state court. Rather, he contends the new affidavits merely flesh-out the existing facts. Specifically, Petitioner argues all factual and legal claims presented within the new affidavits were "fairly presented" in Petitioner's state application. For example, Petitioner stated in his state application:

> There were also numerous friends and family members who testified at the sentencing phase who should have been called to testify before the jury at trial. They testified that Petitioner had no history of family abuse or violence of any kind, and that it was uncharacteristic of the nature of Petitioner to be violent toward anyone, *as well as other testimony that would have been helpful to Petitioner's defense.* [Petition, p. 13 (emphasis added) ]

Petitioner contends his father, Edwin Tenny, is identified in this class of persons.

> Petitioner also stated in his application:
> Trial counsel's abdication of his basic threshold responsibility to ascertain the facts and seek out and interview potential witnesses is the antithesis of sound trial strategy. [Petition, p. 13]
> Petitioner gave his attorney their names, phone numbers and address. [Petition, p. 14]
> It was the professional duty of Petitioner's trial counsel, particularly in this situation, to present all available evidence to support his defense. [Petition, p. 14]

Petitioner contends Rebecca Silvernail fits in this class of persons.

Petitioner also alleged in his application that counsel was ineffective for failing to investigate and present "all available evidence to support his defense" and to "fully investigate the Petitioner's defense." [Petition, p. 16 and 17]. Petitioner contends this includes counsel's duty to perform, at a minimum, an investigation of potential witnesses, including eye-witness accounts and other witness statements contained within the various police statements available to counsel. Petitioner maintains Loren Marshall, Vincent Steven Becker and Wallace Brown are such witnesses.

To satisfy the exhaustion requirement, "a habeas petitioner must have fairly presented the substance of his claim to the state courts." *Anderson v. Johnson,* 338 F.3d 382 (5th Cir.2003) (quoting *Nobles v. Johnson,* 127 F.3d 409 (5th Cir.1997) (citing *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971))). This requirement is not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Id.* (citing *Nobles v. Johnson,* 127 F.3d 409 (5th Cir.1997) (citing *Anderson v. Harless,* 459 U.S. 4, 6–7, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982))). The Fifth Circuit has consistently held that a "petitioner fails to exhaust state remedies when he presents *material* additional evidentiary support to the federal court that was not presented to the state court." *Id.* (quoting *Graham v. Johnson,* 94 F.3d 958, 968 (5th Cir.1996) (emphasis added)).

The Fifth Circuit has explained although exhaustion inquiries are fact-specific, as a general rule "dismissal is not required when evidence presented for the first time in a habeas proceeding *supplements,* but does not *fundamentally alter,* the claim presented to the state courts." *Id.* (quoting *Caballero v. Keane,* 42 F.3d 738, 741 (2d Cir.1994) (citing *Vasquez v. Hillery,* 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (emphasis added))). Courts have explained that "although a habeas petitioner will be allowed to present 'bits of evidence' to a federal court that were not presented to the state court," evidence that "places the claims in a significantly different legal posture must first be

presented to the state courts." *Id.* (quoting *Demarest v. Price,* 130 F.3d 922, 932 (10th Cir.1997)).

In *Graham v. Johnson,* 94 F.3d 958 (5th Cir.1996), the Fifth Circuit rejected, for failure to exhaust, a petitioner's attempt to present—for the first time in federal habeas proceedings—"significant evidentiary support" not previously submitted to the state court. The "new" evidence at issue in *Graham* offered in support of the petitioner's claims of ineffective assistance of counsel and actual innocence, included affidavits of several eyewitnesses and alibis, a police report, two psychologist reports, and a firearms report. *Id.* After considering these nine "new" exhibits, the Fifth Circuit concluded that, because the petitioner had "presented significant evidentiary support ... that was never presented to the state courts" he had not exhausted his state remedies and dismissal of his federal habeas petition was warranted. *Id.* at 969.

In *Dowthitt v. Johnson,* 230 F.3d 733 (5th Cir.2000), however, the Fifth Circuit concluded that two supplemental affidavits, submitted for the first time in support of a federal habeas petition, did not render the petitioner's claims unexhausted. In *Dowthitt,* the petitioner asserted, *inter alia,* a claim of ineffective assistance of counsel founded largely on his attorney's failure to present mental-illness evidence during the penalty phase of his trial. In federal habeas proceedings, Dowthitt introduced the affidavits of two mental health experts in support of his claims. Even though the affidavits had not been presented to the state court, the Fifth Circuit concluded that because the petitioner "had presented to the state habeas court his assertions of mental illness," the "affidavits add[ed] little to those claims" and did not warrant dismissal for failure to exhaust state remedies. *Id.* at 746

More recently in *Anderson v. Johnson,* 338 F.3d 382 (5th Cir.2003), the Fifth Circuit determined the petitioner had exhausted his state court remedies even though he had not presented the affidavit of an eyewitness to the crime to the state court, which he presented in his federal application for habeas corpus relief. The Fifth Circuit acknowledged Anderson's claims were unquestionably in a comparatively "stronger evidentiary posture" than they were in state court. *Id.* at 388 (quoting *Joyner v. King,* 786 F.2d 1317, 1320 (5th Cir.1986)). However, the court found several facts militating in favor of exhaustion including Anderson's state post-conviction brief dedicated to ineffective assistance was remarkably detailed in both fact and law. *Id.* Anderson specifically named the eyewitness and alleged, if his trial counsel would have interviewed and subpoenaed him to trial, the witness would have identified the petitioner as not the person that he knew as the shooter. *Id.* The Fifth Circuit found the "new" evidence (the witness's affidavit) did not "fundamentally alter" Anderson's state claim. Rather, the court stated the affidavit merely confirms what Anderson had been asserting all along. *Id.* The court concluded the witness's affidavit was a "supplement" to the record presented to the state court, but does not "place the claims in a significantly different legal posture." *Id.* (quoting *Demarest,* 130 F.3d at 932). Accordingly, the court held Anderson's claims were exhausted. *Id.*

Unlike Anderson, Petitioner did not specifically name Rebecca Silvernail, Loren Marshall, Edwin Tenny, Vincent Steven Becker and Wallace Brown as potential witnesses. Also, he did not specifically allege what each of these individuals would have likely testified to had they been called as witnesses. As such, this case is more similar to *Graham.* The new affida-

vits in this case can easily be described as "significant evidentiary support" and do fundamentally alter Petitioner's claim. Contrary to Petitioner's contentions, the new affidavits do more than merely supplement Petitioner's existing claims. As such, his claims relying on the new affidavits are unexhausted.

This determination, however, does not end the Court's examination with regard to these claims. Rather, the Court must determine whether Petitioner's claims are procedurally barred and whether Petitioner should be excused from the procedural default.[1]

In this case Petitioner's unexhausted claims are procedurally barred. A subsequent state application for habeas corpus on Petitioner's unexhausted issues would be futile as it would be denied pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4 as an abuse of the writ. When a state court decision rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts lack jurisdiction to review the merits of the case. *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991). In order for a claim of procedural default to preclude federal review of a habeas petitioner's claim, the last state court issuing a reasoned decision must have clearly and unequivocally relied upon the procedural default as an independent and adequate ground for denying relief. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). Additionally, even though a claim has not been reviewed by the state courts, this Court may find that claim to be procedurally barred. *Coleman,* 501 U.S. at 735, 111 S.Ct. at 2557. The general rule that a state court must explicitly apply a procedural bar to pre-

clude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred. *Id.* at n. 1, 111 S.Ct. 2546.

A petitioner can still obtain federal habeas review on a claim denied by the state court on the grounds of procedural default if he can show cause and actual prejudice for his procedural default or that a failure to address the merits of the federal claim would result in a miscarriage of justice. *Moore v. Roberts,* 83 F.3d 699, 702 (5th Cir.1996), citing *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546, *cert denied,* 519 U.S. 1093, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997).

Petitioner argues the procedural default of these claims is the result of the state habeas court's failure to conduct an evidentiary hearing or provide for other discovery mechanisms. Petitioner compares his case to *Strickler v. Greene,* 527 U.S. 263, 283, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), a case in which the petitioner alleged a *Brady* violation. In *Strickler* the petitioner had difficulty in discovering the factual basis of his claim because the exculpatory evidence was allegedly concealed from the petitioner by the prosecution, not the trial court. Additionally, Petitioner cannot allege he could not have obtained his father's affidavit without the help of the trial court or that he could not have alleged in his state application that Silvernail had been told by Mulvey that Mulvey had stabbed her previous husband. Although this Court has complained time and time again about the inadequate review state courts give habeas petitions, the lack of an evidentiary hearing or formal discovery at the state court does not constitute

---

1. Although Respondent generally argues Petitioner's new affidavits are unexhausted, she

completely fails to address the procedural default.

cause for Petitioner's failure to specifically allege the factual basis of his claims.

Petitioner alternatively argues he meets the fundamental miscarriage of justice exception for overcoming a state procedural default. The miscarriage of justice exception to the procedural default doctrine requires " 'factual innocence and not mere legal insufficiency.' " *United States v. Jones*, 172 F.3d 381, 384 (5th Cir.1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998)). "To establish actual innocence, [the] petitioner must demonstrate that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.' " *Bousley*, 523 U.S. at 623, 118 S.Ct. at 1611 (quoting *Schlup v. Delo*, 513 U.S. at 328, 115 S.Ct. at 867). A substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial. *Schlup*, 513 U.S. at 324, 115 S.Ct. at 865. Additionally, the Fifth Circuit has concluded a showing of facts which are highly probative of an affirmative defense which if accepted by a jury would result in the defendant's acquittal constitutes a sufficient showing of "actual innocence" to exempt a claim from the bar of procedural default. *Finley v. Johnson*, 243 F.3d 215 (5th Cir.2001).

In *Finley*, the petitioner, a city councilman for the City of Gladewater, Texas, was convicted of aggravated kidnapping. *Id.* at 217. The victim was Louis Towery. *Id.* Finley asked Towery if he had been molesting Erika, Towery's daughter. *Id.* Towery threatened to kill her. *Id.* Finley put a gun to Towery's side and asked him again whether he had been molesting Erika for years. *Id.* Tower admitted he had. *Id.* Finley ultimately bound Towery with duct tape and tied him to a mailbox near a cemetery. *Id.* He then called the police and told them to pick Towery up. *Id.* Towery was released by police a few minutes later. *Id.*

Finley raised the defense of necessity, arguing his actions were necessary to protect Towery's wife and child from immediate harm. *Id.* At trial the prosecutor argued there was no immediate danger to the child or wife. *Id.* at 221. The jury rejected the petitioner's claim of necessity and found Finley guilty of aggravated kidnapping. Later, the petitioner discovered, two days after the offense, the same prosecutor had obtained a restraining order against Towery and argued Towery must be restrained from contact with his wife and daughter because he had committed violence against them and there was a clear and present danger of more violence which would cause "immediate and irreparable injury, loss and damage." *Id.* The supporting affidavit of Martha Towery stated her daughter was "scared to death" of Towery and feared he would continue to molest her if he were allowed to remain in the house. *Id.*

In determining whether this new evidence established the requisite probability that he was actually innocent, the Fifth Circuit determined there was at least a reasonable probability that a jury, after hearing this evidence, would have rejected the prosecutor's argument that there was "no way in the world" that Towery's wife and daughter were in any immediate danger the day Finley abducted him. *Id.* The court noted this new evidence was both undisputed and highly probative of Finley's affirmative defense of necessity. *Id.* The court concluded Finley made a sufficient showing of actual innocence to satisfy

the fundamental miscarriage of justice exception for his procedurally defaulted *Brady* claim. *Id.* at 221–22.

In *Fairman v. Anderson*, 188 F.3d 635 (5th Cir.1999), the petitioner was convicted of murder, less than capital, in the State of Mississippi. Fairman argued the murder was committed in self-defense, claiming he hit the victim with a stick two to four times when he saw the victim reach for a knife as he was coming toward him. *Id.* at 638. Fairman testified he stopped hitting the victim when the victim ceased his approach. *Id.* According to the testimony, the victim had fallen to the ground but then rose and walked away in the direction of his house. *Id.* Although the victim received medical treatment, he died in his sleep from an epidural hematoma. *Id.* Prewitt, the only eyewitness at the scene of this altercation and an altercation that occurred between Fairman and the victim earlier that day, testified he had seen the victim with a knife at the first altercation, but he had not seen any weapon at the time of the second altercation. *Id.*

Prewitt later recanted his testimony. *Id.* In his signed affidavit Prewitt stated the victim had wielded a butcher knife during the second encounter and Fairman had struck the victim only after the threat from the knife became apparent. *Id.* He explained he committed perjury only because the police coerced him into making a false statement by threatening to charge him with the murder of the victim if he did not testify for the State. *Id.*

In determining whether this new evidence established the requisite probability that Fairman was actually innocent, the Fifth Circuit noted Fairman's self-defense claim was anchored by the district court's *crucial* credibility determination that Prewitt gave a trustworthy eyewitness account when he testified in the evidentiary hearings held in federal court. *Id.* at 645. The court explained, belief in Prewitt's testimony confirms Fairman's claim of self-defense such that it was not just possible but more likely than not that no reasonable juror would have convicted him. *Id.* The court concluded, accepting Prewitt's testimony as true, necessitates a finding that Fairman was actually innocent. *Id.*

In the case at hand, Petitioner's new evidence is in the form of the affidavits, six original and five new. The affidavits are highly probative of his claim of self-defense. However, the State has not had the opportunity to dispute the information contained in these affidavits and no court has made any credibility determinations with regard to the witnesses. As such, the Court cannot conclude Petitioner's evidence in its current form makes it more likely than not that no reasonable juror would have convicted him.

Even though Petitioner has not overcome his procedural default, he is still entitled to habeas corpus relief, as explained below, based on the original affidavits he presented to the state court. As explained by Petitioner, the new affidavits are simply "icing on the cake." Having concluded Petitioner failed to overcome his procedural default, the Court turns to the merits of Petitioner's claims.

**B. The Antiterrorism and Effective Death Penalty Act of 1996**

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"],[2] which radically altered the standard of review by this Court in federal habeas corpus proceedings filed by state prisoners pursuant to Title 28 U.S.C. § 2254. Un-

---

**2.** Pub.L. No. 104–132, 110 Stat. 1214 (1996).

der the AEDPA's new standard of review, this Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1) or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2).

The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of ... [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir.2000) (quoting *(Terry) Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)). The inquiry into whether the decision was based on an "unreasonable determination of the facts" constrains a federal court in its habeas review due to the deference it must accord the state court. *See id.*

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by ... [the Supreme Court] on a question of law or if the state court decides a case differently than ... [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 740–71.

Section 2254(d)(2) speaks to factual determinations made by the state courts.

*See* 28 U.S.C. § 2254(e)(1). While we presume such determinations to be correct, the petitioner can rebut this presumption by clear and convincing evidence. *See id.* Absent an unreasonable determination in light of the record, we will give deference to the state court's fact findings. *See id.* § 2254(d)(2).

Additionally, the law is now clear "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly ... that application must also be unreasonable." *Anderson v. Johnson*, 338 F.3d 382 (5th Cir.2003)(quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495, 146 L.Ed.2d 389). In the Fifth Circuit, a federal habeas court reviews "only a state court's 'decision,' and not the written opinion explaining that decision." *Id.* (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002) (en banc) (explaining that "our focus should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.")). With these principles in mind, this Court must now turn to the issues raised by the pleadings in this cause.

## C. Ineffective Assistance of Trial Counsel

Petitioner argues he was denied effective assistance of trial counsel. Specifically, Petitioner claims his counsel was ineffective for failing to call defense witnesses, failing to make proper objections, failing to explore a valid defense, giving erroneous advice at sentencing, and having a conflict of interest. Petitioner raised these same issues in his supplemental appellate brief and his state application for habeas corpus relief. The state courts rejected the mer-

its of Petitioner's claim. As such, the AEDPA limits the scope of this Court's review to determining whether the adjudication of Petitioner's claim by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 686–689, 104 S.Ct. at 2064–65. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. at 2065. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (Citation omitted). Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged. *Id.* at 695–97, 104 S.Ct. at 2069. Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687, 104 S.Ct. at 2064.

Respondent attempts to shield Bennett's actions by claiming they were trial strategy. In *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066, the Supreme Court defined the deference owed to strategic judgments in terms of the adequacy of the investigations supporting those judgments:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular deci-

sion not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Petitioner argues counsel was ineffective because he failed to call and/or interview witnesses who would have given favorable testimony. Attached to his application are the affidavits of William Y. Penn, Florence Dente Parker, Samuel Alexander Greene, Jr. a/k/a Father Benedict, Sarah Louise Cramer a/k/a Mother Seraphima, Jonathan I. Hitt a/k/a Father Jeremiah, and Joseph Swift. These affidavits were also presented to the state court.

In his affidavit Penn admits he testified at trial but asserts he would have testified further that Petitioner and his wife were having difficulties because the wife refused to allow Petitioner's son to reside with them. Penn had agreed to provide a place on his ranch for Petitioner's trailer so that Petitioner and his son could reside together. Penn asserted when he heard about Mulvey's death, he went to the hospital to see Petitioner. Penn described Petitioner as looking like he had been "run over by a threshing machine." Penn asserts Petitioner's right eye was black and blue, his right ear was cut and a tube was coming out of his chest emptying blood from a punctured lung into a bag on the floor. Penn also described Petitioner's mental state after he had been released on bond.

Parker asserts in her affidavit she resides at St. Anna's Elder Haus on the grounds of the Christ of the Hills Monastery. She explained her residence was next door to her deceased sister Caroline D. Greene. Mulvey cared for Ms. Greene and other residents at St. Anna's Elder Haus. Parker described Mulvey's extraordinary strength. Parker also asserted she and Mulvey disagreed over Greene's treatment which resulted in Mulvey placing

towels and tablecloths over the windows and doors to prevent Parker from interfering. The morning Mulvey quit her job at St. Anna's Elder Haus, Mulvey told Parker she would kill Petitioner and burn down the house before she would have any of his kids come to stay or live there or change the status quo in any way. Parker asserts she immediately called the Monastery and spoke to Mother Seraphima.

Father Benedict attests he hired Mulvey to fill a vacancy at St. Anna's Elder Haus in which his mother, Caroline Greene resided. During Mulvey's employment, Petitioner had told Father Benedict of the conflict between him and Mulvey regarding Petitioner's children. Father Benedict counseled Petitioner regarding the conflict. At one point, Petitioner had told Father Benedict that Mulvey had threatened him and poked at him with a large knife. According to Father Benedict, Petitioner intended to move off the property he and Mulvey shared. Father Benedict attests, the day of Mulvey's death, she quit midmorning at St. Anna's Elder Haus, but returned for her final paycheck that evening. Father Benedict asserts Father Jeremiah met with Mulvey when she returned for her check and reported the events of that meeting to Father Benedict, who in turn called Petitioner to tell him to be calm and get out of the house. Father Benedict asserts Mulvey answered the phone and she was agitated and argumentative. Father Benedict allegedly asked Mulvey to have Petitioner return his call which he did five to ten minutes later. Petitioner told Father Benedict Mulvey had been drinking and was threatening him physically. Father Benedict asserts he told Petitioner to get out of there until things calmed down and suggested he stay in the Monastery or with friends. According to Father Benedict, Petitioner assured him he would be leaving and that he was

only going to try to get some poetry and other personal papers out of the house since Mulvey was threatening to burn it down. Father Benedict also suggested he call Father Jeremiah regarding the days' earlier events. Later that evening, a church member called Father Benedict and informed him Petitioner had been air flighted to Brackenridge Hospital and a woman was dead at Petitioner's house. Father Benedict called Father Steven Rhudy, an Orthodox Priest in Austin, and asked that he go to the hospital and give the Last Rites to Petitioner and report to him on his condition.

Mother Seraphima asserts she would have testified that Mulvey had been hired to care for Greene and to look in on the other elderly residents of St. Anna's Elder Haus. Mother Seraphima described Mulvey's strength and believed she could throw almost any grown man to the ground. The day Mulvey quit her job she told Mother Seraphima she had been fired and she came for her final paycheck. As Mother Seraphima was leaving the gift shop of the Monastery to return to the Convent, she saw Father Jeremiah and Mulvey standing in the parking lot. Mother Seraphima states she could hear Mulvey yelling and saw her trying to hit Father Jeremiah. As Mulvey was leaving in a rage, Mother Seraphima heard her yell she was going to burn down the Monastery and that she was going to do something that would hurt them for the rest of their lives.

Father Jeremiah asserts he would have testified regarding the conflict between Mulvey and Parker regarding Greene's care. He also asserts he would have testified about Petitioner's and Mulvey's conflict regarding Petitioner's children. According to Father Jeremiah, Mulvey stated, "I'm damn near 60 years old. I've raised my kids. I'm through raising kids. He thinks he can just bull me over and bring home one of his kids—just like that?! I'm not going to take it. Besides, Jim and his kids just lay around all weekend watching TV when he has them, expecting me to serve them. They're all a bunch of lazy slobs wanting me to run behind them cleaning up their messes." Father Jeremiah also states Mulvey had threatened to kill the Petitioner, bury him in the yard and burn the house down. Father Jeremiah states he reported her actions to Father Benedict. Additionally, Father Jeremiah states, when Mulvey came to get her final paycheck, she threatened to blackmail him and repeated her threat to burn the Monastery to the ground.

Joseph Swift, who was called by defense counsel to testify at trial, stated counsel interviewed him approximately three hours. During such interview, Swift asserts he informed counsel about the telephone conversation he had with Mulvey the day of her death including Mulvey's statement that she would burn down the house before she lost it to the creditors or to the petitioner. According to Swift, counsel failed to question him during trial regarding Mulvey's threat about burning down the house. Instead, Swift asserts counsel asked him only about Mulvey's phone call to him regarding her request for money.

### 1. Self–Defense

Petitioner argues he received ineffective assistance of counsel when Bennett failed to investigate and/or call witnesses or elicit testimony from witnesses possessing highly relevant factual evidence supporting his only defense, self-defense. The state habeas court did not order trial counsel to provide an affidavit explaining why he did not call the potential witnesses to testify or why he did not question Penn and Swift

further. As explained above, the Court held an evidentiary hearing on this matter on November 13, 2002, at which Bennett testified.

Bennett admitted at the evidentiary hearing that self-defense was Petitioner's only viable defense. [Hearing Tr., p 55]. However, other than Petitioner's own testimony, Bennett failed to elicit any testimony supporting such defense. For example, despite the obvious potential value of Parker's testimony, she was never interviewed by Bennett and never called as a witness. [Hearing Tr., p. 59]. Parker was expressly identified by police records as a person having relevant knowledge. [Father Jeremiah's Statement to Police, May 15, 1997 ("Jeremiah Statement", p. 3)]. Bennett claimed he did not interview Parker because he believed she was incompetent. [Hearing Tr., p. 58]. However, having never interviewed Parker, Bennett was in no position to make this determination. Furthermore, Bennett's notes specifically state Parker was in fact competent. [Hearing Tr., p. 62; Bennett Notes, p. 21]. With respect to Mother Seraphima, Bennett claimed he did not know she had any significant information to offer. [Hearing Tr., p. 65]. As Petitioner pointed out, that is the purpose of interviewing witnesses— to determine what they know. [Hearing Tr., p. 66].

Bennett defended his strategy by explaining he feared bringing the victim's state of mind into evidence because he was worried there were people who could testify that Mulvey's state of mind was that she was afraid Petitioner was going to kill her. [Hearing Tr., p. 85]. When questioned about the evidence supporting Mulvey's state of mind, Bennett only identified two potential witnesses, Tonya Abers and Mulvey's unnamed sister. [Hearing Tr., p. 118–19]. He interviewed neither and failed to investigate what either could provide. Neither witness testified at Petitioner's trial.

As explained by Petitioner, Mulvey's state of mind was already an issue because he pleaded self-defense, claiming Mulvey was the initial aggressor. *Tate v. State,* 981 S.W.2d 189, 192–93 (Tex.Crim.App. 1998) (in self-defense cases, evidence of the victim's state of mind is admissible as long as it has relevance apart from character conformity). Although there were several witnesses, having probative "state of mind" evidence, Bennett chose to offer none. Bennett apparently abandoned a critical area of evidence because he did not know the law. The Court agrees with Petitioner that Bennett's explanation for excluding highly relevant evidence has no basis in law or logic and therefore cannot be attributable to trial strategy.

Bennett also defended his strategy by explaining he feared bringing in the potential taint of the Monastery. After Mulvey's death, Father Jeremiah and Father Benedict were indicted for what Bennett described as multiple counts of indecency with a child involving sexual improprieties with one of their young monks. [Hearing Tr., p. 92.]. According to Bennett, Father Jeremiah was subsequently found guilty and sentenced to ten years in prison. [Hearing Tr., p. 92]. Father Benedict pleaded guilty and was placed on ten years deferred adjudication. [Hearing Tr., p. 92]. Overall, Bennett described the Monastery as having a poor reputation in the community. [Hearing Tr., p. 92].

However, Bennett admitted in two motions for continuance filed in Petitioner's criminal case that the testimony of Father Benedict and Father Jeremiah was crucial. After Father Benedict and Father Jeremiah had been indicted, Bennett chose not to call them as witnesses. In fact, as Petitioner points out, Bennett filed yet another motion for continuance "because we didn't

want to have to go in there while these allegations were pending." [Hearing Tr., pp. 92–93]. As explained by Petitioner, this is another example of Bennett's lack of understanding of the law, because Texas Rules of Evidence 608 and 609 would prohibit inquiry by the prosecution into any *pending* charges. Bennett admitted during the evidentiary hearing the worse-case scenario in calling these witnesses to testify would be that their testimony would not be believed. [Hearing Tr., p. 74].

As argued by Petitioner, Bennett could have requested a change of venue, conducted voir dire regarding the Monastery, Father Benedict and Father Jeremiah and then moved to exclude for cause any inappropriate jurors or moved in limine to keep out irrelevant and prejudicial information regarding the Monastery and Fathers Benedict and Jeremiah. Again, Bennett took no action and instead abandoned Petitioner's only defense.

Father Jeremiah's and Father Benedict's testimony was necessary to establish the foundation for Mulvey's desperation, her threats of violence against Petitioner and the unstable behavior she exhibited shortly before her death. Dr. Penn's testimony was critical to establish the foundation for Petitioner's claim that Mulvey was the initial aggressor and Petitioner possessed reasonable apprehension of imminent death. Swift's testimony was necessary to establish the foundation for Mulvey's desperation and her unreasonable behavior on the morning of her death. Mother Seraphima's testimony was critical to establish Mulvey's irrational and violent behavior on the evening of her death. Despite the overwhelming amount of evidence supporting Petitioner's defense, Bennett presented none.

In addition Bennett did not even develop critical facts from Petitioner's own testimony such as:

1. On Friday, May 9, 1997, Mulvey became hysterical, threatened Petitioner with violence, and poked him in the chest with a knife—the very same knife she would later stab him with on the night she died;

2. Petitioner told Dr. Penn and Father Benedict, that weekend, about the Friday incident and showed them the knife marks on his chest;

3. Petitioner was aware Mulvey was making threats against his life and behaving irrationally and erratically; and

4. Petitioner was informed Mulvey had stabbed her previous husband.

At the evidentiary hearing, Bennett testified he was unsure why he left this testimony out. [Hearing Tr., p. 81]. Petitioner's testimony was essential to establish Mulvey was the initial aggressor and that he possessed reasonable apprehension of imminent death.

Not only was Petitioner's case plagued with counsel's unreasonable investigation and ultimate determination not to introduce state-of-mind evidence, it was doomed due to counsel's misunderstanding of the law.

Having found counsel was ineffective, the Court must examine whether Petitioner has demonstrated prejudice. At trial, Bennett introduced no relevant evidence, concerning Petitioner's and Mulvey's states of mind. Because Petitioner's case relied on the theory of self-defense and the physical evidence as to who was the first aggressor was inconclusive, this omission was devastating. Petitioner needed to demonstrate to the jury that Mulvey, a woman significantly smaller and lighter than he and ten years his senior, not only was the first aggressor, but also attacked him with sufficient intensity to make his subsequent use of deadly force objectively

reasonable. Evidence of Mulvey's state of mind was crucial. Despite this, none of the evidence that Mulvey repeatedly threatened to kill Petitioner, threatened to burn their house down, threatened to burn the Monastery down, nor evidence of her extremely agitated, desperate and erratic behavior was presented. In addition Bennett introduced no evidence of Petitioner's state of mind. When weighed against the totality of the evidence that was presented to the jury, the failure to introduce any of this testimony was highly prejudicial. Petitioner has certainly shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

The only remaining question is whether the state court's denial of Petitioner's application was not only wrong, but "unreasonable." To make this assessment, the Court must determine whether the state court's denial of Petitioner's writ on the ineffective assistance issue "involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Having independently reviewed the entire state court record in this case, the Court finds the state court's application of clearly established federal law unreasonable with respect to Petitioner's claim that he received ineffective assistance of counsel with respect to his self-defense claim.

### 2. Sudden Passion

Petitioner also argues his attorney's advise concerning sentencing amounts to ineffective assistance of counsel. Petitioner explains counsel advised him to waive his right to a jury at sentencing to avoid a harsh sentence. However, Petitioner asserts counsel failed to inform him the issue of sudden passion could have been raised at the sentencing phase before the jury as a mitigating circumstance. Petitioner similarly argues counsel failed to object to the court's charge for not including the elements of sudden passion arising from an adequate cause. Petitioner also faults counsel for failing to present evidence during sentencing before the judge to demonstrate sudden passion.[3]

Bennett's claimed strategy is even more flawed with regard to Petitioner's sentencing. Petitioner chose to be sentenced by the judge rather than the jury. The judge presiding over Petitioner's trial was a visiting judge. Therefore, counsel's fears regarding Monastery taint should have been allayed and he should have offered evidence regarding the earlier attack on Petitioner, Mulvey's repeated threats of arson, blackmail and murder. In fact, Bennett admitted he did not fear the trial judge would have the same kind of prejudice he believed existed in the community. [Hearing Tr., p 127]. At sentencing Bennett introduced no evidence at all concerning Mulvey's state-of-mind or the bases for Petitioner's apprehension. When contrasted with the overwhelming weight of evidence that could have been raised, the significance of Bennett's deficient performance is clear. As argued by Petitioner, there is no strategy in this decision, much less a reasoned strategy.

Petitioner can easily show prejudice. The Fifth Circuit has held that in the noncapital sentencing context, prejudice requires a showing of a reasonable probability that, absent counsel's unprofessional errors, the noncapital sentence would have been "*significantly* less harsh." *Daniel v. Cockrell,* 283 F.3d 697 (5th Cir.2002) (quoting *Spriggs v. Collins,* 993 F.2d 85, 88 (5th

---

**3.** Had Petitioner proven sudden passion, his maximum sentence would have been 20 years. *See* TEXAS PENAL CODE ANN. § 12.33, 19.02(d).

Cir.1993) (emphasis in original)). *See also United States v. Stewart,* 207 F.3d 750, 751 (5th Cir.2000) (same); *Durrive v. United States,* 4 F.3d 548, 551 (7th Cir.1993) (quoting with approval this portion of *Spriggs* ); *Martin v. United States,* 109 F.3d 1177, 1178 (7th Cir.1996) (must show "counsel's deficient performance led to a 'significant' increase in the sentence").[4]

There is some question as to whether or not *Spriggs* was abrogated by *Glover v. United States,* 531 U.S. 198, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001), in which the Supreme Court held any extra time in prison would be significant. Nevertheless, Petitioner's 65–year sentence is considerably more harsh than it would have been had his attorney adequately presented his case for sudden passion and thereby reduce the maximum term to which Petitioner could be sentenced.

Again the Court is faced with the question of whether the state court's denial of Petitioner's application was not only wrong, but "unreasonable." To make this assessment, the Court must determine whether the state court's denial of Petitioner's writ on the ineffective assistance issue "involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Having independently reviewed the entire state court record in this case, the Court finds the state court's application of clearly established federal law unreasonable with respect to Petitioner's claim that he received ineffective assistance of counsel with respect to his claim of sudden passion.

### 3. Failure to Object

Petitioner also argues his attorney rendered ineffective assistance because he failed to object to prejudicial, improper comments made by the prosecutor during closing arguments. Petitioner further argues counsel failed to ask the court to instruct the jury to disregard the inappropriate arguments and failed to move for mistrial. Petitioner has failed to show that failing to object to the prosecutor's comments amounted to deficient performance or that he was prejudiced thereby. Accordingly, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.

### 4. Conflict of Interest

Finally, Petitioner argues counsel engaged in conduct which assumes the appearance of a conflict of interest. Petitioner asserts his attorney accepted a job from the Blanco County District Attorney soon after Petitioner's conviction. According to Petitioner, counsel was hired as a special prosecutor to prosecute two of Petitioner's main witnesses, Father Benedict and Father Jeremiah on unrelated charges. On state habeas review Sam Oatman, the District Attorney for the 33rd Judicial District of the State of Texas, provided his affidavit stating trial counsel was hired on September 1, 1999, nearly four months after Petitioner's trial was concluded. *Ex parte Tenny,* Appl. No. 48, 704–01 at 106–107. He attests at no time prior to Petitioner's conviction was any consideration given to employing Petitioner's trial counsel. *Id.* He further attests there was not even any funding for the position until well after

---

4. An exception to this "significant prejudice" rule is when a deficiency by counsel resulted in a specific, demonstrable enhancement in sentencing which would not have occurred but for counsel's error. *See United States v. Phillips,* 210 F.3d 345 (5th Cir.2000). Such is not the case in the instant cause.

Petitioner's trial. *Id.* Oatman concludes of the many applicants considered for the job, John Bennett was the most qualified and was hired on that basis. *Id.* Tom Cloudt, First Assistant District Attorney for the 33rd Judicial District of the State of Texas, also provided his affidavit. *Id.* at 108–109. Cloudt similarly asserts Bennett was not hired until after Petitioner's trial and no time prior to the conviction was any consideration given to employing Bennett. *Id.* at 108. Cloudt further asserts Bennet was not hired as a special prosecutor for Father Benedict or Father Jeremiah. *Id.* According to Cloudt, he and Oatman prosecuted the case in which Father Jeremiah was convicted of Indecency with a Child and Father Benedict pleaded guilty to Indecency with a Child. *Id.* Cloudt further asserts the trial court in Father Jeremiah's case heard evidence and found no conflict or problem with Oatman trying the case and no impropriety with Bennett being employed by his office. *Id.* After consideration of the affidavits, the state habeas court found no offer of employment or prospective employment, nor any conversation inducing any hope of employment, was made to Bennett, prior to conclusion of trial. *Id.* at 104. The habeas court concluded the alleged conflict of interest did not form the basis for a claim of ineffective assistance of counsel. *Id.* On the only claim the state court specifically addressed, this Court finds nothing unreasonable in its application of clearly established federal law or in the state court's determination of facts in light of the evidence.

### 5. Conclusion

Because Petitioner's application for writ of habeas should be granted on the basis he received ineffective assistance of trial counsel, it is not necessary to examine the remainder of Petitioner's claims. However, in the event the District Court should

disagree with this Court's determination, the Court has analyzed those claims as set forth below.

### D. Insufficient Evidence

Petitioner contends the evidence is insufficient to support his conviction. Petitioner argues the evidence presented at his trial proves he killed his common law wife, Joyce Mulvey, in self-defense. At trial Petitioner testified Mulvey threw gasoline on him, tried to set him on fire with a lighter and hit him in the head with a platter while he was making a 911 call. He further testified she attacked him with a large butcher knife, cutting and stabbing him repeatedly, including stabbing him in the lung, before Petitioner responded with deadly force. Petitioner contends, because there were no eyewitnesses to the fight, there was no evidence to contradict Petitioner's account of the fight. Additionally, Petitioner argues the medical testimony from both the State and defense witnesses supports his self-defense claim, raising a reasonable doubt as to the State's allegations. Dr. Bayardo testified for the State and indicated Mulvey's injuries "are just as consistent with attacking someone or struggling over a knife as they are with [her] being attacked." SF V at 109. Testifying on behalf of Petitioner, Dr. Frost testified about the serious nature of Petitioner's injuries. SF V at 149–179. Frost further testified both Petitioner's and Mulvey's injuries were consistent with either having been the aggressor and with Petitioner acting in self-defense. SF V at 159.

Petitioner raised this claim in his supplemental brief to the court of appeals and his state application for habeas corpus relief. Although the supplemental brief was not filed, the intermediate court of appeals reviewed the record in light of Petitioner's claims and found his claims to be without merit. *Ex parte Tenny,* Appl. 48,704–01 at

95. Additionally, the Texas Court of Criminal Appeals denied Petitioner's application for habeas corpus relief. *Id.* at cover.

The standard for testing the sufficiency of evidence in a federal habeas review of a state court conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Leahy,* 82 F.3d 624, 633 (5th Cir.1996).

In order to find Petitioner guilty of murder, the jury had to find that he committed assault and he (1) intentionally or knowingly caused the death of an individual; (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of an individual; or (3) committed or attempted to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he committed or attempted to commit an act clearly dangerous to human life that caused the death of an individual. TEX. PENAL CODE ANN. § 19.02(b). Self-defense is an affirmative defense to murder. In Texas a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PEN. CODE ANN. § 9.31(a).

During the course of his testimony, Petitioner admitted to intentionally and know-ingly causing the death of Mulvey by stabbing her in the chest and abdomen with a knife. SF VI at 94. He explained:

> I, I may have had, gave you the wrong impression. When I shoved that knife into her, I shoved it into her with every bit of strength and every bit of power I had. She went down on the chair. I fell on top of her, basically pulling the knife to the side and I could feel it twisting inside of her as I was pushing it and my weight was going down on it, it was going sideways but it was in as far as it could go.

SF VI at 96–97. After restating earlier testimony from the doctor who examined the victim's body, the prosecutor continued the questioning:

Q. Now, how did you—so you pulled it out of her at that time?

A. Yes.

Q. And you stabbed her again?

A. Yes.

Q. And you stabbed her again?

A. Yes.

Q. And you stabbed her again?

A. Yeah.

SF VI at 96–97.

At best, the medical evidence was inconclusive as to whether Petitioner was the aggressor or the defender. However, Petitioner admitted to repeatedly stabbing his wife when the testimony indicated the need for such force no longer existed. Just because Petitioner was the only eyewitness to the fight, does not mean the jury had to believe his testimony. As explained above, counsel did not provide evidence which would have supported Petitioner's claim of self-defense. After viewing the evidence, as it stands in the record and in the light most favorable to the prosecution, any rational trier of

fact could have found Petitioner guilty of murder beyond a reasonable doubt.

### E. Improper Jury Argument

Petitioner argues the prosecutor stated in closing argument that Petitioner was "sloshing gas everywhere." In doing so, Petitioner contends the prosecutor injected new facts into the evidence because at trial his neighbor had testified he saw Petitioner carrying a gas can but did not see any gas come out of the can. SF IV at 158. Mark McMain, E.M.T., testified he did not smell gasoline in the house but smelled it on Petitioner in the ambulance. SF IV at 187. Officer Menan Sumbling likewise testified he did not smell gasoline in the house, SF IV at 51, as did Officer Miller. SF IV at 90.

Additionally, Petitioner complains the prosecutor implied Petitioner was trying to coverup his crime when he told the jury Petitioner waited an hour and 18 minutes before he told Officer Miller his wife doused him with gasoline. Petitioner believes the prosecutor was trying to confuse the jury as to the time when police arrived. Petitioner also believes the prosecutor was trying to mislead the jury with regard to the 911 calls.

Petitioner also accuses the prosecutor of misstating the law contrary to the trial court's charge in his closing argument. The prosecutor told the jury, "Whether it was justified or not, it's not your call. If he was in a rage, he's not entitle[d] to self-defense." SF VI at 165–166. Petitioner argues he is entitled to defend his life and use self-defense. Petitioner asserts the prosecutor's errors were so egregious that the cumulative impact had an adverse effect on the minds of the jury and contributed to his conviction.

An improper prosecutorial argument that does not implicate a specific constitutional provision is not cognizable on collateral review unless the defendant shows an abridgment of due process, i.e., the improper argument rendered the proceeding fundamentally unfair. *See Ward v. Whitley*, 21 F.3d 1355, 1364 (5th Cir.1994), *cert. denied*, 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995); and *Bagley v. Collins*, 1 F.3d 378, 380 (5th Cir.1993). Improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir.1995), *cert. denied*, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir.1988), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989); and *Byrne v. Butler*, 845 F.2d 501, 507 (5th Cir.1988), *cert. denied*, 487 U.S. 1242, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988).

"A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Ortega v. McCotter*, 808 F.2d 406, 410 (5th Cir.1987) (*quoting Menzies v. Procunier*, 743 F.2d 281, 288–89 (5th Cir.1984)). The burden is on the habeas petitioner to show a reasonable probability that but for the objectionable remarks the result would have been different. *Nichols v. Scott*, 69 F.3d at 1278 (*citing Felde v. Blackburn*, 795 F.2d at 403).

Having independently reviewed the entire state court record, there is no reasonable probability that but for the remarks of which Petitioner complains the results of his trial would have been different. The Court notes Petitioner's trial attorney reminded the jury to consider the evidence and not what the attorneys say. SF VI at

127. As such, Petitioner's claim regarding prosecutorial misconduct does not merit federal habeas corpus relief.

## F. Ineffective Assistance of Appellate Counsel

Petitioner argues he received ineffective assistance of appellate counsel in that counsel failed to present all of his grounds of error to the court of appeals. Petitioner's appellate counsel informed Petitioner by letter that she had filed a brief in his case but did not anticipate a favorable result. *See* Exhibit A to Respondent's Answer at 10. Counsel stated she:

> read the Statement of Facts in your case very carefully, but found almost no preserved error in the record. This was due to several factors. First of all, the District Attorney tried a very clean case in as far as not attempting to enter legally questionable evidence. Second, your attorney made several objections to evidence which were sustained and objectionable evidence, therefore, was not admitted. Third, your attorney made few other objections to any evidence or to the charge or opening and closing arguments of the State. Without properly made objections, it is impossible to find error in the Reporters Record.

*Id.*

A criminal defendant has a constitutional right to effective assistance of counsel in his first appeal as of right. *Hughes v. Booker,* 203 F.3d 894, 896 (5th Cir.2000) (citing *Evitts v. Lucey,* 469 U.S. 387, 393–95, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985)). Where a petitioner argues that counsel failed to assert or fully brief a particular claim, he must show that his attorney's performance was both deficient and prejudicial. *Id.* (citing *Penson v. Ohio,* 488 U.S. at 84, 109 S.Ct. at 352–54 (citing *Strickland v. Washington,* 466 U.S. 668, 689–94, 104 S.Ct. 2052, 2065–67, 80

L.Ed.2d 674 (1984))). Appellate counsel is not ineffective because he failed to raise the issues presented by the defendant or because he failed to raise every possible point on appeal. *Sharp v. Puckett,* 930 F.2d 450, 452 (5th Cir.1991).

Petitioner has failed to demonstrate that his appellate counsel was deficient for not raising the additional grounds or that he was prejudiced thereby. As explained above, some of Petitioner's claims regarding ineffective assistance of counsel have no merit. Those that are meritorious were not fully developed at the time of appeal. The proper avenue for pursuing those claims is in an application for habeas corpus relief, which Petitioner in fact filed. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Appellate counsel was not deficient in failing to raise such claims and Petitioner has not demonstrated how he was prejudiced thereby. Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that he received ineffective assistance of appellate counsel.

## RECOMMENDATION

The Court recommends that the District Court grant the writ of habeas corpus, and order the Petitioner released unless the State provides Petitioner with a new trial within 60 days of the final judgment in this case.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The

District Court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir.1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 150–153, 106 S.Ct. 466, 472–74, 88 L.Ed.2d 435 (1985); *Douglass v. United Servs. Auto. Assoc.,* 79 F.3d 1415 (5th Cir.1996)(*en banc*).

The Clerk is directed to send a copy of this Report and Recommendation to the parties by certified mail, return receipt requested.

August 7, 2003.